# UNITED STATES v. S.A. EMPRESA DE VIACAO AEREA RIO GRANDENSE (VARIG AIRLINES) ET AL.

No. 82–1349.   Argued January 18, 1984—Decided June 19, 1984*

*Together with No. 82–1350, *United States* v. *United Scottish Insurance Co. et al.*, also on certiorari to the same court.

*Deputy Solicitor General Geller* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath, Carter G. Phillips, Leonard Schaitman,* and *John C. Hoyle.*

*Richard F. Gerry* argued the cause for respondents in both cases and filed a brief for respondents in No. 82–1350. *Phillip D. Bostwick* and *James B. Hamlin* filed a brief for respondent Varig Airlines in No. 82–1349. *Robert R. Smiley III* filed a brief for respondents Mascher et al. in No. 82–1349.†

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari in these two cases to determine whether the United States may be held liable under the Federal Tort Claims Act, 28 U. S. C. § 2671 *et seq.*, for the negligence of the Federal Aviation Administration in certificating certain aircraft for use in commercial aviation.

I

A. *No. 82–1349*

On July 11, 1973, a commercial jet aircraft owned by respondent S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) was flying from Rio de Janeiro to Paris when

---

†*Marc S. Moller* and *Donald I. Marlin* filed a brief for the Association of Trial Lawyers of America as *amicus curiae* urging affirmance.

a fire broke out in one of the aft lavatories. The fire produced a thick black smoke, which quickly filled the cabin and cockpit. Despite the pilots' successful effort to land the plane, 124 of the 135 persons on board died from asphyxiation or the effects of toxic gases produced by the fire. Most of the plane's fuselage was consumed by a postimpact fire.

The aircraft involved in this accident was a Boeing 707, a product of the Boeing Co. In 1958 the Civil Aeronautics Agency, a predecessor of the FAA, had issued a type certificate[1] for the Boeing 707, certifying that its designs, plans, specifications, and performance data had been shown to be in conformity with minimum safety standards. Seaboard Airlines originally purchased this particular plane for domestic use; in 1969 Seaboard sold the plane to respondent Varig Airlines, a Brazilian air carrier, which used the plane commercially from 1969 to 1973.

After the accident respondent Varig Airlines brought an action against the United States under the Federal Tort Claims Act seeking damages for the destroyed aircraft. The families and personal representatives of many of the passengers, also respondents here, brought a separate suit under the Act pressing claims for wrongful death. The two actions were consolidated in the United States District Court for the Central District of California.

Respondents asserted that the fire originated in the towel disposal area located below the sink unit in one of the lavatories and alleged that the towel disposal area was not capa-

---

[1] Before introducing a new type of aircraft, a manufacturer must first obtain from the FAA a type certificate signifying that the basic design of the aircraft meets the minimum criteria specified in the safety regulations promulgated by the FAA. 49 U. S. C. § 1423(a); 14 CFR §§ 21.11–21.53 (1983). When applying for a type certificate, the manufacturer must supply the FAA with detailed plans, data, and documentation illustrating the aircraft design and demonstrating its compliance with FAA regulations. FAA employees or private employees who represent the FAA then examine the manufacturer's submission for conformity with the regulations. See infra, at 805–806.

ble of containing fire. In support of their argument, respondents pointed to an air safety regulation requiring that waste receptacles be made of fire-resistant materials and incorporate covers or other provisions for containing possible fires. 14 CFR § 4b.381(d) (1956). Respondents claimed that the CAA had been negligent when it inspected the Boeing 707 and issued a type certificate to an aircraft that did not comply with CAA fire protection standards. The District Court granted summary judgment for the United States on the ground that California law does not recognize an actionable tort duty for inspection and certification activities. The District Court also found that, even if respondents had stated a cause of action in tort, recovery against the United States was barred by two exceptions to the Act: the discretionary function exception, 28 U. S. C. § 2680(a),[2] and the misrepresentation exception, § 2680(h).[3]

The United States Court of Appeals for the Ninth Circuit reversed. 692 F. 2d 1205 (1982). The Court of Appeals reasoned that a private person inspecting and certificating aircraft for airworthiness would be liable for negligent inspection under the California "Good Samaritan" rule, see Restatement (Second) of Torts §§ 323 and 324A (1965), and concluded that the United States should be judged by the same rule. 692 F. 2d, at 1207–1208. The Court of Appeals rejected the Government's argument that respondents' actions were barred by 28 U. S. C. § 2680(h), which provides that the United States is not subject to liability for any claim

[2] Under 28 U. S. C. § 2680(a), the United States may not be held liable under the Act for:

"Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

[3] Title 28 U. S. C. § 2680(h) states that the provisions of the Act shall not apply to "[a]ny claim arising out of . . . misrepresentation . . . ."

arising out of misrepresentation. Interpreting respondents' claims as arising from the negligence of the CAA inspection rather than from any implicit misrepresentation in the resultant certificate, the Court of Appeals held that the misrepresentation exception did not apply. 692 F. 2d, at 1208. Finally, the Court of Appeals addressed the Government's reliance upon the discretionary function exception to the Act, 28 U. S. C. § 2680(a), which exempts the United States from liability for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty. . . ." The Court of Appeals viewed the inspection of aircraft for compliance with air safety regulations as a function not entailing the sort of policymaking discretion contemplated by the discretionary function exception. 692 F. 2d, at 1208–1209.

### B. *No. 82–1350*

On October 8, 1968, a DeHavilland Dove aircraft owned by respondent John Dowdle and used in the operation of an air taxi service caught fire in midair, crashed, and burned near Las Vegas, Nev. The pilot, copilot, and two passengers were killed. The cause of the crash was an in-flight fire in the forward baggage compartment of the aircraft.

The DeHavilland Dove airplane was manufactured in the United Kingdom in 1951 and then purchased by Air Wisconsin, another air taxi operator. In 1965 Air Wisconsin contracted with Aerodyne Engineering Corp. to install a gasoline-burning cabin heater in the airplane. Aerodyne applied for, and was granted, a supplemental type certificate[4] from the FAA authorizing the installation of the heater. Aerodyne then installed the heater pursuant to its contract

---

[4] Any person who alters an aircraft by introducing a major change in the type design must obtain from the FAA a supplemental type certificate. 14 CFR § 21.113 (1983). In order to obtain such a certificate, the applicant must supply the FAA with drawings, plans, and other data sufficient to establish that the altered aircraft meets all applicable airworthiness requirements. § 21.115. See *infra*, at 806–807.

with Air Wisconsin. In 1966, relying in part upon the supplemental type certificate as an indication of the airplane's airworthiness, respondent Dowdle purchased the DeHavilland Dove from Air Wisconsin.

In the aftermath of the crash, respondent Dowdle filed this action for property damage against the United States under the Federal Tort Claims Act. Respondent insurance companies also filed suit under the Act, seeking reimbursement for moneys paid for liability coverage on behalf of Dowdle. The United States District Court for the Southern District of California found that the crash resulted from defects in the installation of the gasoline line leading to the cabin heater. The District Court concluded that the installation did not comply with the applicable FAA regulations and held that the Government was negligent in certifying an installation that did not comply with those safety requirements. Accordingly, the District Court entered judgment for respondents.

On appeal, the United States Court of Appeals for the Ninth Circuit reversed and remanded for the District Court to consider whether the California courts would impose a duty of due care upon the Government by applying the "Good Samaritan" doctrine of §§ 323 and 324A of the Restatement (Second) of Torts. 614 F. 2d 188 (1979). The Court of Appeals also requested the District Court to determine whether, under the facts of this case, the California courts would find such a duty breached if a private person had issued the supplemental type certificate in question here. On remand, the District Court again entered judgment for respondents, finding that the California "Good Samaritan" rule would apply in this case and would give rise to liability on these facts.

On the Government's second appeal, the Ninth Circuit affirmed the judgment of the District Court. 692 F. 2d 1209 (1982). In so holding, the Court of Appeals followed reasoning nearly identical to that employed in its decision in No. 82–1349, decided the same day.

We granted certiorari, 461 U. S. 925 (1983), and we now reverse.

## II

In the Federal Aviation Act of 1958, 49 U. S. C. § 1421(a)(1),[5] Congress directed the Secretary of Transportation to promote the safety of flight of civil aircraft in air commerce by establishing minimum standards for aircraft design, materials, workmanship, construction, and performance. Congress also granted the Secretary the discretion to prescribe reasonable rules and regulations governing the inspection of aircraft, including the manner in which such inspections should be made. § 1421(a)(3). Congress emphasized, however, that air carriers themselves retained certain responsibilities to promote the public interest in air safety: the duty to perform their services with the highest possible degree of safety, § 1421(b), the duty to make or cause to be made every inspection required by the Secretary, § 1425(a), and the duty to observe and comply with all other administrative requirements established by the Secretary, § 1425(a).

Congress also established a multistep certification process to monitor the aviation industry's compliance with the requirements developed by the Secretary. Acting as the

---

[5] In 1958, when the type certificate for the Boeing 707 aircraft owned by respondent Varıg Airlines was issued, the Civil Aeronautics Act of 1938, 52 Stat. 1007, was the governing statute. Because the relevant provisions of the Federal Aviation Act are virtually identical to those of its predecessor, see Civil Aeronautics Act of 1938, §§ 601, 605, 52 Stat. 1007–1008, 1010–1011, for ease of reference we will refer only to the current version of the statute.

As originally enacted, the Federal Aviation Act vested in the Federal Aviation Agency all regulatory authority over aviation safety. See Pub. L. 85–726, § 101, 72 Stat. 737. This agency was later renamed the Federal Aviation Administration and placed in the Department of Transportation. Pub. L. 89–670, §§ 3(e), 6(c)(1), 80 Stat. 932, 938. All the functions, powers, and duties of the Federal Aviation Agency were then transferred to the Secretary of Transportation. § 6(c)(1), 80 Stat. 938.

Secretary's designee,[6] the FAA has promulgated a comprehensive set of regulations delineating the minimum safety standards with which the designers and manufacturers of aircraft must comply before marketing their products. See 14 CFR pts. 23, 25, 27, 29, 31, 33, and 35 (1983). At each step in the certification process, FAA employees or their representatives evaluate materials submitted by aircraft manufacturers to determine whether the manufacturer has satisfied these regulatory requirements. Upon a showing by the manufacturer that the prescribed safety standards have been met, the FAA issues an appropriate certificate permitting the manufacturer to continue with production and marketing.

The first stage of the FAA compliance review is type certification. A manufacturer wishing to introduce a new type of aircraft must first obtain FAA approval of the plane's basic design in the form of a type certificate. After receiving an application for a type certificate, the Secretary must "make, or require the applicant to make, such tests during manufacture and upon completion as the Secretary . . . deems reasonably necessary in the interest of safety. . . ." 49 U. S. C. § 1423(a)(2). By regulation, the FAA has made the applicant itself responsible for conducting all inspections and tests necessary to determine that the aircraft comports with FAA airworthiness requirements. 14 CFR §§ 21.33, 21.35 (1983). The applicant submits to the FAA the designs, drawings, test reports, and computations necessary to show that the aircraft sought to be certificated satisfies FAA regulations. §§ 21.17(a)(1), 21.21(a)(b).[7] In the course of the type certi-

---

[6] See Pub. L. 89–670, § 6(c)(1), 80 Stat. 938.

[7] One major manufacturer of commercial aircraft estimated that in the course of obtaining a type certificate for a new wide-body aircraft it would submit to the FAA approximately 300,000 engineering drawings and changes, 2,000 engineering reports, and 200 other reports. In addition, it would subject the aircraft to about 80 major ground tests and 1,600 hours of flight tests. National Research Council, Committee on FAA Airworthiness Certification Procedures, Improving Aircraft Safety 29 (1980) (hereinafter Improving Aircraft Safety).

fication process, the manufacturer produces a prototype of the new aircraft and conducts both ground and flight tests. § 21.35. FAA employees or their representatives then review the data submitted by the applicant and make such inspections or tests as they deem necessary to ascertain compliance with the regulations. § 21.33(a). If the FAA finds that the proposed aircraft design comports with minimum safety standards, it signifies its approval by issuing a type certificate. 49 U. S. C. § 1423(a)(2); 14 CFR § 21.21(a)(1) (1983).

Production may not begin, however, until a production certificate authorizing the manufacture of duplicates of the prototype is issued. 49 U. S. C. § 1423(b). To obtain a production certificate, the manufacturer must prove to the FAA that it has established and can maintain a quality control system to assure that each aircraft will meet the design provisions of the type certificate. 14 CFR §§ 21.139, 21.143 (1983). When it is satisfied that duplicate aircraft will conform to the approved type design, the FAA issues a production certificate, and the manufacturer may begin mass production of the approved aircraft.

Before any aircraft may be placed into service, however, its owner must obtain from the FAA an airworthiness certificate, which denotes that the particular aircraft in question conforms to the type certificate and is in condition for safe operation. 49 U. S. C. § 1423(c). It is unlawful for any person to operate an aircraft in air commerce without a valid airworthiness certificate. § 1430(a).

An additional certificate is required when an aircraft is altered by the introduction of a major change in its type design. 14 CFR § 21.113 (1983). To obtain this supplemental type certificate, the applicant must show the FAA that the altered aircraft meets all applicable airworthiness requirements. § 21.115(a). The applicant is responsible for conducting the inspections and tests necessary to demonstrate that each change in the type design complies with the regulations. §§ 21.115(b), 21.33(b). The methods used by FAA

employees or their representatives to determine an applicant's compliance with minimum safety standards are generally the same as those employed for basic type certification. FAA Order 8110.4, Type Certification 32 (1967) (hereinafter FAA Order 8110.4); CAA Manual of Procedure, Flight Operations and Airworthiness, Type Certification § .5106(a) (1957) (hereinafter CAA Manual of Procedure).

With fewer than 400 engineers, the FAA obviously cannot complete this elaborate compliance review process alone. Accordingly, 49 U. S. C. § 1355 authorizes the Secretary to delegate certain inspection and certification responsibilities to properly qualified private persons. By regulation, the Secretary has provided for the appointment of private individuals to serve as designated engineering representatives to assist in the FAA certification process. 14 CFR § 183.29 (1984). These representatives are typically employees of aircraft manufacturers who possess detailed knowledge of an aircraft's design based upon their day-to-day involvement in its development. See generally Improving Aircraft Safety 29–30. The representatives act as surrogates of the FAA in examining, inspecting, and testing aircraft for purposes of certification. 14 CFR § 183.1 (1984). In determining whether an aircraft complies with FAA regulations, they are guided by the same requirements, instructions, and procedures as FAA employees. FAA Order 8110.4, p. 151; CAA Manual of Procedure § .70(b). FAA employees may briefly review the reports and other data submitted by representatives before certificating a subject aircraft. Improving Aircraft Safety 31–32; FAA Order 8110.4, p. 159; CAA Manual of Procedure § .77.

## III

The Federal Tort Claims Act, 28 U. S. C. § 1346(b), authorizes suits against the United States for damages

"for injury or loss of property, or personal injury or
. death caused by the negligent or wrongful act or omis-

sion of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

The Act further provides that the United States shall be liable with respect to tort claims "in the same manner and to the same extent as a private individual under like circumstances." § 2674.

The Act did not waive the sovereign immunity of the United States in all respects, however; Congress was careful to except from the Act's broad waiver of immunity several important classes of tort claims. Of particular relevance here, 28 U. S. C. § 2680(a) provides that the Act shall not apply to

"[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, *or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.*" (Emphasis added.)

The discretionary function exception, embodied in the second clause of § 2680(a), marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.

Although the Court has previously analyzed the legislative history of § 2680(a), see *Dalehite* v. *United States*, 346 U. S. 15, 26–30 (1953), we briefly review its highlights for a proper understanding of the application of the discretionary function exception to this case. During the years of debate and dis-

cussion preceding the passage of the Act, Congress considered a number of tort claims bills including exceptions from the waiver of sovereign immunity for claims based upon the activities of specific federal agencies, notably the Federal Trade Commission and the Securities and Exchange Commission. See, *e. g.*, H. R. 5373, 77th Cong., 2d Sess. (1942); H. R. 7236, 76th Cong., 1st Sess. (1940); S. 2690, 76th Cong., 1st Sess. (1939).[8] In 1942, however, the 77th Congress eliminated the references to these particular agencies and broadened the exception to cover all claims based upon the execution of a statute or regulation or the performance of a discretionary function. H. R. 6463, 77th Cong., 2d Sess. (1942); S. 2207, 77th Cong., 2d Sess. (1942). The language of the exception as drafted during the 77th Congress is identical to that of § 2680(a) as ultimately adopted.

The legislative materials of the 77th Congress illustrate most clearly Congress' purpose in fashioning the discretionary function exception. A Government spokesman appearing before the House Committee on the Judiciary described the discretionary function exception as a "highly important exception:"

> "[It is] designed to preclude application of the act to a claim based upon an alleged abuse of discretionary authority by a regulatory or licensing agency—for example, the Federal Trade Commission, the Securities and Exchange Commission, the Foreign Funds Control Office of the Treasury, or others. It is neither desirable nor intended that the constitutionality of legislation, the legality of regulations, or the propriety of a discretionary administrative act should be tested through the medium

---

[8] For example, § 303(7) of H. R. 7236, 76th Cong., 1st Sess. (1940), provided that the waiver of sovereign immunity should not extend to "[a]ny claim for damages caused by the administration of any law or laws by the Federal Trade Commission or by the Securities and Exchange Commission."

of a damage suit for tort. The same holds true of other administrative action not of a regulatory nature, such as the expenditure of Federal funds, the execution of a Federal project, and the like.

"On the other hand, the common law torts of employees of regulatory agencies, as well as of all other Federal agencies, would be included within the scope of the bill." Hearings on H. R. 5373 and H. R. 6463 before the House Committee on the Judiciary, 77th Cong., 2d Sess., 28, 33 (1942) (statement of Assistant Attorney General Francis M. Shea).[9]

It was believed that claims of the kind embraced by the discretionary function exception would have been exempted from the waiver of sovereign immunity by judicial construction; nevertheless, the specific exception was added to make clear that the Act was not to be extended into the realm of the validity of legislation or discretionary administrative action. *Id.*, at 29; *id.*, at 37, Memorandum, with Appendixes, Federal Tort Claims Act (explanatory of Comm. Print of H. R. 5373, 1942). It was considered unnecessary to except by name such agencies as the Federal Trade Commission and the Securities and Exchange Commission, as had earlier bills, because the language of the discretionary function exception would "exemp[t] from the act claims against Federal agencies *growing out of their regulatory activities.*" *Id.*, at 8 (emphasis added).

The nature and scope of § 2680(a) were carefully examined in *Dalehite* v. *United States, supra. Dalehite* involved vast claims for damages against the United States arising out of a disastrous explosion of ammonium nitrate fertilizer, which had been produced and distributed under the direction of the United States for export to devastated areas occupied by the Allied Armed Forces after World War II. Numerous acts of

---

[9] The Committee incorporated the Government's view into its Report almost verbatim. H. R. Rep. No. 2245, 77th Cong., 2d Sess., 10 (1942).

the Government were charged as negligent: the cabinet-level decision to institute the fertilizer export program, the failure to experiment with the fertilizer to determine the possibility of explosion, the drafting of the basic plan of manufacture, and the failure properly to police the storage and loading of the fertilizer.

The Court concluded that these allegedly negligent acts were governmental duties protected by the discretionary function exception and held the action barred by § 2680(a). Describing the discretion protected by § 2680(a) as "the discretion of the executive or the administrator to act according to one's judgment of the best course," *id.*, at 34, the Court stated:

> "It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." *Id.*, at 35–36 (footnotes omitted).

Respondents here insist that the view of § 2680(a) expressed in *Dalehite* has been eroded, if not overruled, by subsequent cases construing the Act, particularly *Indian Towing Co.* v. *United States*, 350 U. S. 61 (1955), and *Eastern Air Lines, Inc.* v. *Union Trust Co.*, 95 U. S. App. D. C. 189, 221 F. 2d 62, summarily aff'd *sub nom. United States* v. *Union Trust Co.*, 350 U. S. 907 (1955). While the Court's reading of the Act admittedly has not followed a straight line, we do not accept the supposition that *Dalehite* no longer rep-

resents a valid interpretation of the discretionary function exception.

*Indian Towing Co.* v. *United States, supra,* involved a claim under the Act for damages to cargo aboard a vessel that ran aground, allegedly owing to the failure of the light in a lighthouse operated by the Coast Guard. The plaintiffs contended that the Coast Guard had been negligent in inspecting, maintaining, and repairing the light. Significantly, the Government *conceded* that the discretionary function exception was not implicated in *Indian Towing,* arguing instead that the Act contained an implied exception from liability for "uniquely governmental functions." *Id.,* at 64. The Court rejected the Government's assertion, reasoning that it would "push the courts into the 'non-governmental'-'governmental' quagmire that has long plagued the law of municipal corporations." *Id.,* at 65.

In *Eastern Air Lines, Inc.* v. *Union Trust Co., supra,* two aircraft collided in midair while both were attempting to land at Washington National Airport. The survivors of the crash victims sued the United States under the Act, asserting the negligence of air traffic controllers as the cause of the collision. The United States Court of Appeals for the District of Columbia Circuit permitted the suit against the Government. In its petition for certiorari, the Government urged the adoption of a "governmental function exclusion" from liability under the Act and pointed to § 2680(a) as textual support for such an exclusion. Pet. for Cert. in *United States* v. *Union Trust Co.,* O. T. 1955, No. 296, p. 18. The Government stated further that § 2680(a) was "but one aspect of the broader exclusion from the statute of claims based upon the performance of acts of a uniquely governmental nature." *Id.,* at 37. This Court summarily affirmed, citing *Indian Towing Co.* v. *United States, supra.* 350 U. S. 907 (1955). Given the thrust of the arguments presented in the petition for certiorari and the pointed citation to *Indian Towing,* the summary disposition in *Union Trust Co.* cannot be taken as a

wholesale repudiation of the view of § 2680(a) set forth in *Dalehite*.[10]

As in *Dalehite*, it is unnecessary—and indeed impossible—to define with precision every contour of the discretionary function exception. From the legislative and judicial materials, however, it is possible to isolate several factors useful in determining when the acts of a Government employee are protected from liability by § 2680(a). First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case. As the Court pointed out in *Dalehite*, the exception covers "[n]ot only agencies of government . . . but all employees exercising discretion." 346 U. S., at 33. Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.

Second, whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regu-

---

[10] Respondents' reliance upon *Rayonier, Inc.* v. *United States*, 352 U. S. 315 (1957), is equally misplaced. In *Rayonier* the Court revisited an issue considered briefly in *Dalehite:* whether the United States may be held liable for the alleged negligence of its employees in fighting a fire. In *Dalehite*, the Court held that alleged negligence in firefighting was not actionable under the Act, basing its decision upon "the normal rule that an alleged failure or carelessness of public firemen does not create private actionable rights." *Dalehite* v. *United States*, 346 U. S., at 43. In so holding, the *Dalehite* Court did not discuss or rely upon the discretionary function exception. The *Rayonier* Court rejected the reasoning of *Dalehite* on the ground that the liability of the United States under the Act is not restricted to that of a municipal corporation or other public body. *Rayonier, Inc.* v. *United States, supra*, at 319 (citing *Indian Towing Co.* v. *United States*, 350 U. S. 61 (1955)). While the holding of *Rayonier* obviously overrules one element of the judgment in *Dalehite*, the more fundamental aspects of *Dalehite*, including its construction of § 2680(a), remain undisturbed.

lator of the conduct of private individuals.[11]   Time and again the legislative history refers to the acts of regulatory agencies as examples of those covered by the exception, and it is significant that the early tort claims bills considered by Congress specifically exempted two major regulatory agencies by name.   See *supra*, at 808–810.   This emphasis upon protection for regulatory activities suggests an underlying basis for the inclusion of an exception for discretionary functions in the Act: Congress wished to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.   By fashioning an exception for discretionary governmental functions, including regulatory activities, Congress took "steps to protect the Government from liability that would seriously handicap efficient government operations."   *United States* v. *Muniz,* 374 U. S. 150, 163 (1963).

## IV

We now consider whether the discretionary function exception immunizes from tort liability the FAA certification process involved in these cases.   Respondents in No. 82–1349 argue that the CAA was negligent in issuing a type certificate for the Boeing 707 aircraft in 1958 because the lavatory trash receptacle did not satisfy applicable safety regulations.   Similarly, respondents in No. 82–1350 claim negligence in the FAA's issuance of a supplemental type certificate in 1965 for the DeHavilland Dove aircraft; they assert that the installation of the fuel line leading to the cabin heater violated FAA airworthiness standards.   From the records in these cases there is no indication that either the Boeing 707 trash receptacle or the DeHavilland Dove cabin heater was actually inspected or reviewed by an FAA inspector or repre-

---

[11] Even the dissenters in *Dalehite* read the legislative history of the discretionary function exception as protecting "that type of discretion which government agencies exercise in regulating private individuals."   *Dalehite* v. *United States,* 346 U. S., at 58, n. 12 (Jackson, J., joined by Black and Frankfurter, JJ., dissenting).

sentative. Brief for Respondent Varig Airlines in No. 82–1349, pp. 8, 15; Brief for United States 10, n. 10, and 37. Respondents thus argue in effect that the negligent failure of the FAA to inspect certain aspects of aircraft type design in the process of certification gives rise to a cause of action against the United States under the Act.

The Government, on the other hand, urges that the basic responsibility for satisfying FAA air safety standards rests with the *manufacturer*, not with the FAA. The role of the FAA, the Government says, is merely to police the conduct of private individuals by monitoring their compliance with FAA regulations. According to the Government, the FAA accomplishes its monitoring function by means of a "spot-check" program designed to encourage manufacturers and operators to comply fully with minimum safety requirements. Such regulatory activity, the Government argues, is the sort of governmental conduct protected by the discretionary function exception to the Act.[12] We agree that the discretionary

[12] The Government presses two additional arguments in support of reversal. First, the Government asserts that the conduct of the FAA in certificating aircraft is a core governmental activity that is not actionable under the Act, because no private individual engages in analogous activity. See 28 U. S. C. §§ 1346(b) and 2674. Second, the Government interprets respondents' claims as based upon misrepresentations contained in the certificates and argues that they are barred by the misrepresentation exception to the Act. § 2680(h); see n. 4, *supra*. Respondents urge that the first argument is precluded by *Indian Towing Co.* v. *United States, supra,* and the second by our decision last Term in *Block* v. *Neal,* 460 U. S. 289 (1983). Because we rest our decision today upon the discretionary function exception, we find it unnecessary to address these additional issues.

The Government also argues that the Court of Appeals erred in applying California's "Good Samaritan" doctrine to the FAA certification process. See *supra,* at 801, 803. But the application of the "Good Samaritan" doctrine is at bottom a question of state law, and we generally accord great deference to the interpretation and application of state law by the Courts of Appeals. See, *e. g., Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation & Dev. Comm'n,* 461 U. S. 190, 214 (1983); *Runyon* v. *McCrary,* 427 U. S. 160, 181–182 (1976) (quoting *Bishop* v. *Wood,* 426 U. S. 341, 346, and n. 10 (1976)). We thus decline the Government's invitation to undertake our own examination of this state-law issue.

function exception precludes a tort action based upon the conduct of the FAA in certificating these aircraft for use in commercial aviation.

As noted *supra*, at 804, the Secretary of Transportation has the duty to promote safety in air transportation by promulgating reasonable rules and regulations governing the inspection, servicing, and overhaul of civil aircraft. 49 U. S. C. § 1421(a)(3)(A). In her discretion, the Secretary may also prescribe

> "the periods for, and *the manner in, which such inspection, servicing, and overhaul shall be made,* including provision for examinations and reports by properly qualified private persons whose examinations or reports the Secretarty of Transportation may accept in lieu of those made by its officers and employees." § 1421(a)(3)(C) (emphasis added).

Thus, Congress specifically empowered the Secretary to establish and implement a mechanism for enforcing compliance with minimum safety standards according to her "judgment of the best course." *Dalehite* v. *United States,* 346 U. S., at 34.

In the exercise of this discretion, the FAA, as the Secretary's designee, has devised a system of compliance review that involves certification of aircraft design and manufacture at several stages of production. See *supra,* at 804–806. The FAA certification process is founded upon a relatively simple notion: the duty to ensure that an aircraft conforms to FAA safety regulations lies with the manufacturer and operator, while the FAA retains the responsibility for policing compliance.[13] Thus, the manufacturer is required to develop the

---

[13] This premise finds ample support in the statute and regulations. See, *e. g.,* 49 U. S. C. § 1421(b) (duty rests on air carriers to perform their services with highest possible degree of safety); § 1425(a) (air carrier has duty to make or cause to be made inspections required by Secretary and duty to comply with regulations); 14 CFR § 21.17 (1983) (applicant for type

plans and specifications and perform the inspections and tests necessary to establish that an aircraft design comports with the applicable regulations; the FAA then reviews the data for conformity purposes by conducting a "spot check" of the manufacturer's work.

The operation of this "spot-check" system is outlined in detail in the handbooks and manuals developed by the CAA and FAA for the use of their employees. For example, the CAA Manual of Procedure for type certification in effect at the time of the certification of the Boeing 707 provided:

> "Conformity determination may be varied depending upon circumstances. *A manufacturer's policies, quality control procedures, experience, inspection personnel, equipment, and facilities will dictate the extent of conformity inspection to be conducted or witnessed by [CAA employees].* Differences between manufacturers require that the conformity program be adjusted to fit existing conditions. In the case of an inexperienced manufacturer whose ability is unknown, it may be necessary to conduct a high percentage of conformity inspections until such time as the [CAA] inspector feels he can safely rely to a greater degree upon the company inspectors. *He may then gradually reduce his own inspection or witnessing accordingly.*
>
> "Experienced manufacturers having previously demonstrated the acceptability of their quality control and inspection competence . . . should benefit by greater [CAA] confidence. *In such cases, conformity determination may be made through a planned system of spot-checking critical parts and assemblies and by reviewing inspection records and materials review dispo-*

---

certificate must show that aircraft meets applicable requirements); § 21.33 (applicant for type certifcate must conduct all tests and inspections necessary to determine compliance); § 21.35 (specifying tests that must be made by applicants for type certificates).

*sitions. . . . It is not intended that the inspector person-
ally conduct a complete conformity inspection of each
part he records on a [CAA] form.*   He should, however,
visually inspect and witness the manufacturer's inspec-
tion of the critical characteristics. . . . In a program of
this type, increased confidence in the manufacturer, plus
a planned program of spot-checking by [CAA employ-
ees], should result in obtaining increased knowledge of
conformity of the end product. . . .

"Regardless of the manufacturer's experience, it is
the [CAA] inspector's responsibility to assure that a
complete conformity inspection has been performed *by
the manufacturer* and that the results of this inspection
are properly recorded and reported."   CAA Manual of
Procedure § .330 (emphasis added).

See also FAA Order 8110.4, pp. 39–40.

As to the engineering review of an application for a type
certificate, the CAA materials note that only a "relatively
small number of engineers" are available to evaluate for
compliance with air safety regulations the data submitted by
applicants.   Accordingly, the Manual states:

*"It is obvious that complete detailed checking of data
is not possible.   Instead, an overriding check method
should be used* [which] is predicated on the fact that the
applicant has completely checked all data presented for
examination.   These data are to be examined in turn by
the [CAA] engineer for method and completeness, and
*with sufficient spot-checking to ascertain that the design
complies with the minimum airworthiness require-
ments."*   CAA Manual of Procedure § .41 (emphasis
added).

See also FAA Order 8110.4, p. 60.[14]

---

[14] In a recent report, the National Academy of Sciences recognized that
because "FAA engineers cannot review each of the thousands of drawings,

The procedure for supplemental type certification is much the same. According to the Manual of Procedure applicable to the supplemental type certification of the DeHavilland Dove, an applicant must submit to the FAA data describing the proposed change in type design, which may be accompanied by drawings or photographs of the suggested alteration. The methods for determining compliance with applicable safety regulations are generally the same as those used for basic type certification. Physical inspections of the proposed modification in type design are required when compliance with the applicable regulations "cannot be determined adequately from an evaluation of the technical data." CAA Manual of Procedure § 5106(b). Moreover, FAA representatives are authorized to approve data covering major changes in type design and obtain supplemental type certifications without prior review by the FAA. *Id.* § 764(a). See also FAA Order 8110.4, pp. 31–32, 158.

Respondents' contention that the FAA was negligent in failing to inspect certain elements of aircraft design before certificating the Boeing 707 and DeHavilland Dove necessarily challenges two aspects of the certification procedure: the FAA's decision to implement the "spot-check" system of compliance review, and the application of that "spot-check" system to the particular aircraft involved in these cases. In our view, both components of respondents' claim are barred by the discretionary function exception to the Act.

The FAA's implementation of a mechanism for compliance review is plainly discretionary activity of the "nature and quality" protected by § 2680(a). When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory

---

calculations, reports, and tests involved in the type certification process," the agency must place great reliance on the manufacturer. Improving Aircraft Safety 6, 29, 31. The report also noted that "in most cases the FAA staff performs only a cursory review of the substance of th[e] overwhelming volume of documents" submitted for its approval. *Id.*, at 31–32.

authority of the most basic kind. Decisions as to the manner of enforcing regulations directly affect the feasibility and practicality of the Government's regulatory program; such decisions require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding. Here, the FAA has determined that a program of "spot-checking" manufacturers' compliance with minimum safety standards best accommodates the goal of air transportation safety and the reality of finite agency resources. Judicial intervention in such decisionmaking through private tort suits would require the courts to "second-guess" the political, social, and economic judgments of an agency exercising its regulatory function. It was precisely this sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent.

It follows that the acts of FAA employees in executing the "spot-check" program in accordance with agency directives are protected by the discretionary function exception as well. See *Dalehite* v. *United States*, 346 U. S., at 36. The FAA employees who conducted compliance reviews of the aircraft involved in this case were specifically empowered to make policy judgments regarding the degree of confidence that might reasonably be placed in a given manufacturer, the need to maximize compliance with FAA regulations, and the efficient allocation of agency resources. In administering the "spot-check" program, these FAA engineers and inspectors necessarily took certain calculated risks, but those risks were encountered for the advancement of a governmental purpose and pursuant to the specific grant of authority in the regulations and operating manuals. Under such circumstances, the FAA's alleged negligence in failing to check certain specific items in the course of certificating a particular aircraft falls squarely within the discretionary function exception of § 2680(a).

## V

In rendering the United States amenable to some suits in tort, Congress could not have intended to impose liability for the regulatory enforcement activities of the FAA challenged in this case. The FAA has a statutory duty to *promote* safety in air transportation, not to insure it. We hold that these actions against the FAA for its alleged negligence in certificating aircraft for use in commercial aviation are barred by the discretionary function exception of the Federal Tort Claims Act. Accordingly, the judgments of the United States Court of Appeals for the Ninth Circuit are reversed.

*It is so ordered.*