107 F.3d 1
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Oscar MONTEJO, Plaintiff, Appellant,
v.
UNITED STATES of America, Defendant, Appellee.
 No. 96-1349.
 United States Court of Appeals, First Circuit.
 Feb. 10, 1997.
 
 Michaela A. Fanning with whom Gerald T. Anglin and Tommasino and Tommasino were on brief for appellant.
 John A. Capin, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.
 Before STAHL, Circuit Judge, BOWNES, Senior Circuit Judge, and LYNCH, Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff Oscar Montejo appeals from summary judgment on his Federal Tort Claims Act case, 28 U.S.C. § 2671 et seq., for injuries received in the Cape Cod National Seashore ("Seashore") when the motorcycle he was riding struck a steel cable road barrier.
 
 
 2
 We review the district court's grant of summary judgment de novo, and using the same criteria incumbent on the district court, we review the record in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. MacGlashing v. Dunlop Equip. Co., 89 F.3d 932, 936 (1st Cir.1996); Crawford v. Lamantia, 34 F.3d 28, 31 (1st Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1393 (1995); Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990).
 
 I. THE FACTS
 
 3
 The facts, viewed most favorably to plaintiff, are as follows. The Seashore consists of land owned entirely by the United States and is part of the national park system. Administration of the Seashore is overseen by the Park Service, a bureau of the United States Department of the Interior. At all relevant times, the Seashore was open to the public without fee for recreational use.
 
 
 4
 The Seashore contains a fire road system which is both accessible ("Open Roads") and restricted ("Closed Roads") to public motor vehicles. Public motor vehicles have limited access to the fire road system and are restricted to using only the Open Roads when traversing the Seashore grounds. The only vehicles permitted to use the Closed Roads of the fire road system are authorized emergency and Park Service vehicles. All other motor vehicles including motorcycles are strictly prohibited from entering onto the Closed Roads of the Seashore.
 
 
 5
 The Park Service has a longstanding policy of barring access into the Closed Roads by placing a cable gate at each entrance way. Each cable gate consists of a length of gray steel cable strung and locked between two posts on each side of the fire road. Only emergency and Park Service personnel have keys that open the gates. The Park Service has a policy of marking each gate with distinct neon streamers and attaching to the gate a sign reading "FIRE ROAD." In addition, at each entrance way, a sign placed next to the gate proclaims "MOTORIZED VEHICLES PROHIBITED." The Park Service regularly patrols the fire roads to inspect, repair and replace vandalized or missing gates and signs.
 
 
 6
 On October 12, 1990, plaintiff was riding a motorcycle at a decommissioned burn dump owned by the Town of Provincetown. A sign posted on the public way leading into the town dump read "MOTORCYCLE TRACK ONLY[.] ALL OTHER VEHICLES TRESPASSING ... [ILLEGIBLE] ... USE AT OWN RISK." Adjacent to the town dump is the Clapps Pond area of the Seashore which has been closed to public motor vehicles for several decades. There are only four points of entry along the boundary of Clapps Pond, all of which are barred by cable gates. The accident occurred at the West Clapps Pond Road point of entry which is located on the boundary between the town dump and Clapps Pond. No Park Service warning signs were visible in the vicinity of this cable gate.
 
 
 7
 It was general knowledge that motorcyclists using the town dump frequently crossed into the Seashore via the West Clapps Pond Road entrance way. During plaintiff's motorcycle excursion, he proceeded approximately 250 yards into the Seashore along West Clapps Pond Road before making a right-hand turn into a dead-end intersection. As soon as he rounded the bend, plaintiff briefly glimpsed an unmarked cable gate across his path. The cable gate was not clearly visible because the dull gray color of the cable blended into the surrounding foliage. There were no warning signs at the side of the gate or on the cable itself. Unable to stop, plaintiff collided with the cable and was thrown from his motorcycle. As a result, plaintiff suffered serious injuries to his neck and back and was forced to crawl to a nearby highway for assistance.
 
 
 8
 The Park Service was first notified of plaintiff's injuries on September 17, 1992, when it received a claim for injuries filed by plaintiff's attorney pursuant to 28 U.S.C. § 2675. Since 1968 and prior to receiving notice of plaintiff's injuries, the Park Service had never received reports of injuries resulting from any motor vehicle accident caused by the cable gates. Plaintiff's claim was denied. Plaintiff then filed a timely complaint in the district court.
 
 II. APPLICABLE LAW
 
 9
 Under the Federal Tort Claims Act, the United States shall be liable in a tort claim "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. In such tort claims, the United States "would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). See United States v. Varig Airlines, 467 U.S. 797, 807-808 (1984); Athas v. United States, 904 F.2d 79, 80 (1st Cir.1990). Because all relevant acts or omissions upon which plaintiff bases his claim occurred in Massachusetts, the law of the Commonwealth applies.
 
 
 10
 Massachusetts limits the liability of landowners who open their property free of charge to the public for recreational purposes. At the time of the plaintiff's injuries, the governing section of the Massachusetts Recreational Use Statute, Mass. Gen. Laws Ann. ch. 21, § 17C (West 1994), read as follows:
 
 
 11
 An owner of land who permits the public to use such land for recreational purposes without imposing a charge or fee therefor, ... shall not be liable to any member of the public who uses said land for the aforesaid purposes for injuries to person or property sustained by him while on said land in the absence of wilful, wanton or reckless conduct by such owner, nor shall such permission be deemed to confer upon any person so using said land the status of an invitee or licensee to whom any duty would be owed by said owner.
 
 
 12
 (Emphasis added). The policy underlying the statute is to encourage landowners to open up their land to recreational users by immunizing them from potential negligence liability resulting from such invitations.
 
 
 13
 The Massachusetts Supreme Judicial Court defines wilful, wanton, or reckless conduct as: "intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." Manning v. Nobile, 582 N.E.2d 942, 946 (Mass.1991). "Our recent practice has been simply to refer to reckless conduct as constituting the conduct that produces liability for what the court has traditionally called wilful, wanton, or reckless conduct." Sandler v. Commonwealth, 644 N.E.2d 641, 643 (Mass.1995).
 
 
 14
 The facts in Sandler are pertinent to the case at bar. Plaintiff was injured when he fell off his bicycle while attempting to go through a tunnel which was part of a bikeway along the Charles River. The bikeway was controlled and maintained by the Commonwealth. The court found that the jury was warranted in finding that plaintiff's fall was caused by an uncovered drain which was eight inches wide and one foot in length. The drain, which was about eight inches deep, had a cover but it had been removed by vandals. Vandals had also rendered the lights in the tunnel inoperative. Id. at 642-43.
 
 
 15
 There was evidence that the MDC (state agency) knew of the dangers but did not respond reasonably. There was also evidence that it was feasible, at a reasonable cost, to install vandal-resistant lighting and irremovable drain covers. The court held: "Nevertheless, the degree of the risk of injury in this case does not meet the standard that we have established for recklessness." Id. at 644.
 
 
 16
 Massachusetts courts apply a two prong test when distinguishing "reckless conduct" from negligence. First, the defendant must intentionally disregard an unreasonable risk, and second, the risk, viewed prospectively, must entail a "high degree of probability that substantial harm would result" to the plaintiff. Sandler v. Commonwealth, 644 N.E.2d at 643; Manning v. Nobile, 582 N.E.2d at 946.
 
 
 17
 Plaintiff argues that Inferrera v. Town of Sudbury, 575 N.E.2d 82 (Mass.App.Ct.1991), supports his contention that the actions of the Park Service amounted to "reckless conduct." In Inferrera, a snowmobiler died as a result of an accident that occurred when his snowmobile collided with a steel cable strung across a path leading into a field. The Massachusetts Appeals Court reversed the trial court's grant of summary judgment for the defendants after finding that inferences existed which a reasonable juror might draw upon to determine that stringing a cable across a path was reckless. The Massachusetts Appeals Court ruled that an
 
 
 18
 actor's conduct is in reckless disregard of the safety of another if he does an act ... knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.
 
 
 19
 Id. at 85.
 
 
 20
 Although Inferrera is superficially similar to the one at hand, it is readily distinguishable. One critical distinction involves the actual installation of the cable gate. The defendant in Inferrera intended to and did install the cable gate without marking it. The court in Inferrera noted that the defendant "had not ordered anything to be hung on the cable to make it 'more visible.' " Id. at 84. The Park Service, on the other hand, implemented a practice spanning several decades of inspecting, marking, and repairing the cable gates. There is no indication that the Park Service intentionally disregarded the cable gate risk. Another important distinction involves the manner in which the cable gates were set up. The cable gate in Inferrera was installed haphazardly in a makeshift arrangement between two trees. In the case at bar, the cable gates were installed between carefully placed posts in accordance with a specially laid out road-access plan. Finally, in Inferrera, the cable gate was the only one installed by the Town, and there was no notice by the Town of the installation of the gate. In the case before us, the cable gates of the Seashore were installed throughout the park several decades beforehand according to a carefully laid out plan, thus engendering some awareness that the Park Service had installed a cable gate system. In fact, plaintiff concedes that he knew that the Park Service had cable gates set up within the Seashore. Based on these important distinctions, we find that the ruling of Inferrera does not extend to the situation here. We have considered all of the contentions made by plaintiff and find them unavailing.
 
 III. CONCLUSION
 
 21
 Based upon our review of the Massachusetts statute and the cases interpreting it, we find that there was no reckless conduct by the employees of the Seashore National Park. The judgment of the district court is, therefore, affirmed. No costs.