**Eleanor BIG OWL, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civil No. 94–5039.**

United States District Court,
D. South Dakota,
Western Division.

Feb. 19, 1997.

Terry L. Pechota, Rapid City, SD, for Plaintiff.

Diana Ryan, Asst. U.S. Atty., Rapid City, SD, for Defendant.

## MEMORANDUM OPINION & ORDER

BOGUE, Senior District Judge.

Pending before the Court is defendant United States of America's motion for summary judgment pursuant to Fed.R.Civ.P. 56(b). All briefing has been received and the matter is ripe for disposition.

### I. BACKGROUND

Plaintiff Eleanor Big Owl was hired by the Porcupine Day School as a teacher for the 1992–93 school year. On August 17, 1992, Big Owl and the Porcupine School Board entered into an employment contract running from August 17, 1992 to May 28, 1993. The

Staff Handbook for the Porcupine Day School addressed the subject of re-employment of school employees. Specifically, section 315 provided:

.01 Employees being offered re-employment shall be notified no later than May 1st.

.02 Employees shall notify the Board in writing within fifteen (15) calendar days of this notification whether or not they accept the offer for re-employment. Failure to provide the Board with such notification shall relieve the Board of the continuing contract.

.03 Notice of contemplated non-renewal must be no later than April 1st.

Section 324 of the Handbook provides:

There are no employee tenure provisions at the school and contract renewal or non-renewal is based on current job performance.

Because of the express concerns of community members, the BIA, and the Oglala Sioux Tribe regarding the current School Board's operation of the schools, on July 10, 1992, the Oglala Sioux Tribal Council established the Tribe's Department of Education, suspended the current Board indefinitely, and vested authority for operating the schools in the Department of Education. Ultimately, a new school board was installed and that Board resumed operations of the Porcupine Day School.

By May 1, 1993, none of the teachers at the Porcupine Day School had received a notice of re-employment as prescribed by § 315.01 of the Handbook. On May 20, 1993, the new school board carried a motion to advertise all of the educational staff positions at the school and accept applications for teaching positions for the upcoming 1993–94 school year. In June of 1993, Big Owl received written notice that applications were being accepted for the position she held during the 1992–93 school year. Big Owl applied for her old teaching position and, on June 29, she was informed by letter that she would not be re-hired. In fact, of the entire school staff from the 1992–93 school year, only one teacher was re-hired for the 1993–94 school year.

Big Owl alleges that as her teaching contract neared its completion, the new school board failed to inform her before April 1, 1993 that it was contemplating non-renewal of her contract. Moreover, Big Owl argues that not having received a non-renewal notice, she rightfully believed that she would be re-employed for the next school year, and when she realized in June 1993 that she would not be re-employed, she suffered emotional distress. (Resp. at 4). Big Owl maintains that it is not the failure to hire or re-hire her for her teaching position that creates her cause of action, but rather the failure of the School to follow its mandatory obligation to issue notices of non-renewal by April 1, 1993 [1]. *Id.* Big Owl argues "it is clear ... that [her] emotional distress fundamentally arises from the school's failure to issue a non-renewal notice to her by April 1, 1993, rightfully leading her to believe that she would be re-employed and thereafter, again failing to follow mandatory school regulations, summarily notifying her [in June 1993] that she in fact would not be re-employed." *Id.* at 4–5. As a result of the Board's allegedly tortious conduct, Big Owl claims she suffered "shock, anger, worry and stress over the loss of her employment. She couldn't sleep." (Resp. at 7).

The Defendant has moved for summary judgment on grounds that Plaintiff has not set forth a prima facie case of intentional or negligent infliction of emotional distress. Alternatively, the Defendant argues the Court should dismiss Plaintiff's lawsuit on grounds that it is barred by the discretionary function exception to the Federal Tort Claims Act (FTCA).

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant can "show that

---

**1.** The Court notes the inconsistency between Big Owl's argument and her deposition testimony wherein, when asked what specifically the Board did to cause her emotional distress, she replied: "Well, they never hired me." (Big Owl depo. at 44–47).

there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–90, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Once the moving party has met this burden, the non-moving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, the Court views the evidence presented based upon which party has the burden of proof under the underlying substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The Supreme Court has instructed that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356, and "[w]here the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

## III. DISCUSSION

The Porcupine Day School is operated by the Oglala Sioux Tribe pursuant to a grant from the Bureau of Indian Affairs (BIA) under the authority of Public Law 100–297, known as the Tribally Controlled Schools Act of 1988 (TCSA), and codified at 25 U.S.C. §§ 2501–2511. The TCSA is a Congressional Act intended to promote the goal of Indian self-government and to encourage tribal self-

sufficiency. It furthers these goals by ensuring maximum Indian participation in the direction of educational services to Indian communities so as to render such services more responsive to the needs and desires of those communities. 25 U.S.C. § 2502(a). The Act is designed to supplant federal domination of services to Indians with effective and meaningful participation by the Indian people in the planning, conduct, and administration of those services and is an enhancement of these concepts made manifest in the Indian Self–Determination and Education Assistance Act (25 U.S.C. § 450 et seq). 25 U.S.C. § 2501. Congress' stated policy behind these Acts is "to provide the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life area of their choice, and to achieve the measure of self-determination essential to their social and economic well-being." 25 U.S.C. § 2502(c); 25 U.S.C. 450a(c).

■ Public Law 101–512 imposes liability upon the United States for the acts of tribal organizations and their employees administering a grant agreement pursuant to the TCSA. Specifically, Pub.L. 101–512 provides:

> With respect to claims resulting from the performance of functions ... under a contract, grant agreement or cooperative agreement authorized by the [ISDEAA] or by the [TCSA] ... an Indian tribe, tribal organization or Indian contractor is deemed hereafter to be part of the [BIA] in the Department of the Interior ... while carrying out any such contract or agreement and its employees are deemed part of the Bureau ... while acting in the scope of their employment in carrying out the contract or agreement: Provided, That any civil action or proceeding involving such claims brought hereafter against any tribe, tribal organization, Indian contractor or tribal employee covered by this provision shall be deemed to be an action against the United States and will be defended by the Attorney General and afforded the full protection and coverage of the Federal Tort Claims Act.

Pub.L. 101–512 (codified at 25 U.S.C. § 450f Historical and Statutory Notes). The end result is that the School Board members are considered employees of the BIA and can be sued as such under the FTCA subject to protections afforded government employees under that Act.

The Federal Tort Claims Act generally provides that the United states shall be liable, to the same extent as a private party, "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). Under one of several exceptions to this broad waiver of sovereign immunity, however, the government is not liable for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The Supreme Court has developed a two-pronged test to analyze whether governmental conduct is immune from suit under this discretionary function exception. *See Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988); and *Chantal v. United States,* 104 F.3d 207 (8th Cir.1997).

■ Initially, the nature of the challenged conduct must be determined since the exception "covers only acts that are discretionary in nature, acts that involve an element of judgment or choice." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958. If a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," then the conduct cannot involve an element of choice because the employee has no rightful option but to comply. *Id.*

■ Secondly, even if the conduct involves an element of choice, the next step of the analysis requires the Court to decide whether the challenged discretionary acts "are the kind that the discretionary function exception was designed to shield." *United States v. Gaubert,* 499 U.S. 315, 322–23, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991). The discretionary function exception is in-tended to prevent judicial "second-guessing" of decisions made by governmental officials which are essentially grounded in "social, economic, and political policy." *Berkovitz,* 486 U.S. at 536–37, 108 S.Ct. at 1958 (citations omitted). It "protects only governmental actions and decisions based on considerations of public policy." (*Berkovitz,* 486 U.S. at 537, 108 S.Ct. at 1958). The exception "thus marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines,* 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984). "It is the nature of the action rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Val–U Construction Company of South Dakota, Inc. v. United States,* 905 F.Supp. 728 (D.S.D.1995) (citing *Varig Airlines,* 467 U.S. at 813, 104 S.Ct. at 2764).

■ Regarding the first prong of the *Berkovitz* analysis, Big Owl maintains that the School Board was not exercising a discretionary function when it failed to notify her of non-renewal of her contract by April 1, 1993 as prescribed in the Handbook. Plaintiff argues, "the issuance of such a notice is not discretionary. It is absolutely required. Failure to issue a non-renewal notice, therefore, cannot under any circumstances be deemed the exercise of a discretionary function by school officials." (Resp. at 4). Thus, Plaintiff argues, because the Board lacked discretion to deviate from its adopted procedures, the board was not exercising a discretionary function when it failed to notify her of the non-renewal. The Court disagrees.

In order for the Board to have no discretion, its actions must be governed by a specific federal statute, regulation, or policy. *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958. The Staff Handbook at issue here does not rise to such a level. Plaintiff cites no federal authority in which the provisions of the Handbook are grounded and therefore obligatory and non-discretionary. Presumably, the School Board itself drafted and adopted

the Handbook. The power to adopt and enforce the Handbook includes the power to amend and deviate from its procedures. The Handbook serves merely as a guide to be followed at the discretion of the Board. At base, the conduct involved here is in the nature of employment decision making. "Issues of employee supervision and retention generally involve the permissible exercise of policy judgment and fall within the discretionary function exception." *Tonelli v. United States,* 60 F.3d 492, 496 (8th Cir.1995). *See also, Val–U Construction Co.,* 905 F.Supp. at 736 (selection and replacement of employees requires choice and judgment and falls within the discretionary function exception); *and, Daly v. Department of Energy,* 741 F.Supp. 202, 206 (D.Colo.1990)(employment decisions are discretionary within the meaning of the exception and are therefore not reviewable by litigation under the FTCA) (citing *Premachandra v. United States,* 574 F.Supp. 365 (E.D.Mo.1983) aff'd. 739 F.2d 392 (8th Cir.1984)). The Court finds that notwithstanding the prescribed procedures in the Staff Handbook, the School Board's decision not to re-hire Plaintiff, and the procedures actually used to inform Plaintiff of that decision, were discretionary within the meaning of the discretionary function exception to the FTCA.

■ Similarly, the Court finds that the decision not to renew Plaintiff's contract is based upon considerations of public policy and is the kind of discretionary act that the discretionary function exception is designed to shield. *Berkovitz,* 486 U.S. at 537, 108 S.Ct. at 1958. Certainly the administration of an Indian school by tribal members is firmly grounded, in the social, economic, and political policies of the TCSA. *Id.* It is clear that Congress intended for the discretion afforded to tribal school boards in making employment decisions, to be exercised in furtherance of the stated policy of providing educational services and opportunities which will "permit Indian children to compete and excel in the life area of their choice, and to achieve the measure of self-determination essential to their social and economic well-being." Moreover, "if [a] regulation allows the [Tribe] discretion, the very existence of the regulation creates a strong presumption

that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Val–U Construction Co.,* 905 F.Supp. at 737 (citing *Gaubert,* 499 U.S. at 324, 111 S.Ct. at 1274). The School Board made the determination that, Ms. Big Owl was no longer the right person to hold the position as the kindergarten teacher. This court is in no position to "second guess" that determination. As a matter of law, Plaintiff's claims for intentional and negligent infliction of emotional distress, based upon the actions of the Board regarding employment decisions, are barred by the discretionary function exception to the Federal Tort claims Act. Consequently, this Court lacks subject matter jurisdiction to proceed in this case.

■ Alternatively, the Court would grant Defendant's motion for summary judgment on grounds that Plaintiff has not made a prima facie case of either intentional or negligent infliction of emotional distress under South Dakota law. As a matter of law, the conduct complained of is not "so extreme as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Richardson v. East River Elec. Power Coop., Inc.,* 531 N.W.2d 23, 27 (S.D.1995). Similarly, as a matter of law, Plaintiff has not alleged any facts which would allow the Court to find that she suffered any accompanying physical injury as a result of the alleged negligently inflicted emotional distress. *Nelson v. WEB Water Development Association. Inc.,* 507 N.W.2d 691 (S.D.1993).

## IV. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendant's motion for summary judgment [doc # 22] is granted and plaintiff's claims for intentional and negligent infliction of emotional distress shall be dismissed with prejudice.

## JUDGMENT

In accordance with the Memorandum Opinion and Order entered this day, it is hereby

ORDERED that Defendant United States of America shall have judgment against Plaintiff Big Owl;

That Plaintiff's claims for intentional and negligent infliction of emotional distress are dismissed with prejudice; and

That costs will be borne by each party respectively.