Argued Sept. 23, 1993
Before: STAPLETON, ROTH and LEWIS, Circuit Judges.
Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA COWEN, NYGAARD, ALITO, ROTH, LEWIS and McKEE, Circuit Judges.
OPINION OF THE COURT
STAPLETON, Circuit Judge:
The Federal Tort Claims Act (“FTCA”), 28 U.S.C. §§ 1346(b), 2671-2680, waives the federal government’s sovereign immunity with respect to tort claims for money damages. The “discretionary function exception” to the FTCA limits that waiver, stating that the government retains sovereign immunity with respect to “[a]ny claim ... based upon the exercise or performance [of,] or the failure to exercise or perform[,] a discretionary function or duty ..., whether or not the discretion involved be abused.” 28 U.S.C. § 2680(a). The appeals now before the court *282 in banc require us to examine the scope of the discretionary function exception.
The plaintiffs in these cases were injured by several policy decisions made by the Commissioner of the Food and Drug Administration (“FDA”) while exercising a discretionary function. They seek to avoid the legal consequences that would flow from application of the discretionary function exception to their cases by (1) looking behind the Commissioner’s injury-causing decision, (2) finding fault with an aspect of the data upon which it may have been based, and (3) arguing that their claims are not “based upon” the Commissioner’s decisions but instead are “based upon” the alleged negligence of various laboratory technicians who supplied the allegedly faulty data to the Commissioner. We reject this attempt to circumvent the discretionary function exception, concluding that if the discretionary function exception to the FTCA is to fulfill its clear and important purpose, a claim must be “based upon” the exercise of a discretionary function whenever the immediate cause of the plaintiffs injury is a decision which is susceptible of policy analysis and which is made by an official legally authorized to make it. Because the plaintiffs’ claims are based upon decisions susceptible of policy analysis and made by an official of the executive branch acting within his authority, we will affirm the district court’s order dismissing these cases for lack of subject-matter jurisdiction.
For the purpose of our analysis, we have assumed the facts alleged by the plaintiffs to be true. Berkovitz v. United States, 486 U.S. 531, 540, 108 S.Ct. 1954, 1960-61, 100 L.Ed.2d 531 (1988). Our “scope of review of the applicability of the discretionary function exception is plenary.” United States Fidelity & Guar. Co. v. United States, 837 F.2d 116, 119 (3d Cir.), cert. denied, 487 U.S. 1235, 108 S.Ct. 2902, 101 L.Ed.2d 935 (1988).
I.
On March 2, 1989, an anonymous caller to the United States Embassy in Santiago, Chile, stated that Chilean fruit bound for the United States would be injected with cyanide. The FDA took the lead agency role in evaluating the seriousness of the call, and it detained all incoming Chilean fruit over the weekend of March 4 and 5 while it undertook an investigation. On March 6, having found no evidence that any Chilean fruit had actually been poisoned, the FDA announced that it considered the call a hoax. It nevertheless continued to conduct experiments concerning the effects that cyanide injections would have on various Chilean fruits.
The embassy in Santiago then received a second anonymous call. This time the warnings were more specific. The caller indicated that he had access to orchards, storage facilities, and shipping locations in Chile, and stated that unidentified fruit had already been injected with cyanide. This prompted the FDA’s Philadelphia District Office to double the inspection level of incoming Chilean fruit, beginning with that arriving on the “Almería Star.” The Philadelphia District Office designated that certain portions of the Almería Star’s cargo would be examined, and any fruit that looked “suspect” was to be sent to the Philadelphia District Office for testing.
The increased level of inspection soon yielded results. On the morning of March 12, an FDA inspector discovered two grapes from the Almería Star which appeared to have been punctured, and which displayed uniform white rings. Further examination of the crate containing these suspect grapes revealed a third white-ringed grape, which, unlike the others, appeared to have been slit rather than punctured. Although the physical appearance of these grapes was inconsistent with that of grapes injected with cyanide during FDA experimentation, the FDA officials as a precautionary measure sent the grapes, as well as the crate in which they were packaged, to the FDA’s Philadelphia laboratory for testing.
The Philadelphia laboratory began testing the grapes for cyanide in the early afternoon of March 12. The FDA technicians used all of the two punctured grapes in conducting their tests, but saved the third, slit, grape for *283 confirmation purposes. The testing process required the grapes to be mashed until they turned into a solution. Sulfuric acid was then added to this slurry, causing a chemical reaction that released in gaseous form any cyanide that was present in the solution. The gas released from the solution was twice exposed to cyanide-sensitive strips of reactive paper, both of which indicated the presence of cyanide. A third test then confirmed a high concentration of cyanide present in the slurry. At approximately 9:30 p.m. on March 12, the Philadelphia laboratory orally reported positive cyanide test results from the solution to the FDA’s Emergency Operations Center.
Meanwhile, FDA officials transferred a portion of the slurry, along with the third, slit, grape and the bunch in which these grapes had been found, to the FDA’s Cincinnati laboratory. Technicians there identified two additional white-ringed grapes on the bunch, but were unable to confirm the presence of cyanide. The Philadelphia laboratory also continued testing other grapes from the suspect crate, as well as all packing materials in that crate. These further tests also failed to reveal the presence of cyanide.
The Commissioner was supplied with the findings of the Philadelphia and Cincinnati laboratories in the early morning hours of March 13. The information before him at that point was that three tests conducted on two of the suspect grapes indicated the presence of cyanide. The retesting of the slurry and the testing of the third “reserved” grape, the other grapes, and the packaging, however, did not confirm the presence of cyanide. He also knew of the reports to the embassy in Santiago and the surveillance activity that had already been conducted. On the basis of this information, the Commissioner on March 13 issued an order refusing entry of any additional Chilean fruit into the United States and requiring the withdrawal and destruction of all Chilean fruit then in domestic channels of distribution. The FDA also issued a press release publicizing the Philadelphia laboratory’s finding of cyanide in two Chilean grapes and the order refusing the entry of Chilean fruit into the United States. Consumers were encouraged to destroy any Chilean fruit in their possession, and grocers were instructed to remove all Chilean fruit from their shelves.
The plaintiffs in these cases are (1) approximately 2400 Chilean growers and exporters of fresh fruit, (2) a Chilean shipping line, (3) three United States firms that are engaged in the importation and distribution of fresh produce, and (4) a non-certified class whose named plaintiff is a Chilean fruit grower. They seek damages from the United States government under the FTCA, 28 U.S.C. § 1346(b), on a negligence theory, contending that the technicians in the FDA’s Philadelphia laboratory were negligent in failing to reserve any portion of the two punctured grapes for later confirmation testing. Plaintiffs claim that this violated both the FDA’s Regulatory Procedures Manual and good laboratory practices generally. As a result, the Cincinnati laboratory was unable to verify the positive result reported by the Philadelphia laboratory. Plaintiffs further allege that the lab technicians were negligent in failing to record their observations contemporaneously with their testing, thereby casting doubt on the accuracy of their results and the content of the oral report, and in failing to take account of the known properties of cyanide in fruit. According to the complaint, but for this negligence, the Commissioner would not have issued his orders and the Chilean fruit business for the spring season of 1989 would not have been destroyed.
The United States moved to dismiss, arguing that the district court lacked subject-matter jurisdiction over plaintiffs’ claims. The district court granted that motion, reasoning that the discretionary function exception to the FTCA shielded the government’s conduct from liability. The plaintiffs appeal.
II.
A.
The Federal Tort Claims Act gives district courts jurisdiction over:
civil actions on claims against the United States, for money damages, accruing on *284 and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
28 U.S.C. § 1346(b). The FTCA thus waives the government’s sovereign immunity with respect to tort claims against the United States for money damages.
This waiver of the government’s immunity is subject to certain exceptions, however, one of which is the discretionary function exception. 28 U.S.C. § 2680(a). As we have noted, that exception dictates that the waiver “shall not apply to ... [a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.”
The discretionary function exception is designed to protect policymaking by the politically accountable branches of government from interference in the form of “second-guessing” by the judiciary — second guessing the result of which burdens the public fisc and the prospect of which skews the decisionmaking process of executive and legislative policymakers. United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808, 104 S.Ct. 2755, 2761-62, 81 L.Ed.2d 660 (1984). As the Court explained in Varig Airlines:
[Wjhatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals. Time and again the legislative history refers to the acts of regulatory agencies as examples of those covered by the exception.... This emphasis upon protection for regulatory activities suggests an underlying basis for the inclusion of an exception for discretionary functions in the Act: Congress wished to prevent judicial “second-guessing” of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.
Id. at 814, 104 S.Ct. at 2764-65 (footnote omitted). Thus, the discretionary function exception is a product of Congress’ recognition that “the imposition of liability for damages occasioned by governmental policymak-ing would necessarily involve a very substantial, if not prohibitive, social cost not only in terms of the imposed liability itself, but also in terms of the constraining effect of that liability on the decisions of governmental policymakers.” Sea-Land Serv., Inc. v. United States, 919 F.2d 888, 890 (3d Cir.1990), cert. denied, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).
Whether the discretionary function exception applies involves a two-pronged inquiry. “[A] court must first consider whether the action is a matter of choice for the acting employee.” Berkovitz, 486 U.S. at 536, 108 S.Ct. at 1958. Second, the court must determine whether the element of judgment involved “is of the kind that the discretionary function exception was designed to shield.” Id. Under this second prong, the court must determine whether the challenged discretionary actions or decisions were “based on considerations of public policy.” Id. at 537, 108 S.Ct. at 1959. “The focus of the inquiry is not on the agent’s subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.” United States v. Gaubert, 499 U.S. 315, 325, 111 S.Ct. 1267, 1275, 113 L.Ed.2d 335 (1991).
B.
The district court, applying these principles to the Commissioner’s decisions to deny entry of Chilean fruit and to destroy Chilean fruit already in the United States, found that the decisions were policy decisions protected by the discretionary function exception to the FTCA. We agree. Specifically, the district court concluded:
The FDA acted to protect the public from the risk of exposure to poisonous fruit *285 which it learned could be coming from Chile. It had the discretion to test the fruit and determine whether the fruit was adulterated. It also had the discretion to refuse entry into the United States. The actions taken were not violative of any regulatory or statutory provisions. The acts taken were in accordance with the FDA’s authority to determine whether or not a specific product should be allowed entrance into the United States. This conduct is grounded in the policy of protecting the public health. The actions were clearly in furtherance of the FDA’s statutory mission to protect the American public from adulterated food. All the acts involved judgment and choice and were grounded in policy.
Balmaceda v. United States, 815 F.Supp. 823, 827 (E.D.Pa.1992).
As the district court found, the Commissioner’s decisions were clearly “matter[s] of choice” for a person occupying his position. As the plaintiffs readily concede, the orders giving rise to these eases were authorized both in the sense that the Commissioner was acting within the scope of his authority[1] and in the sense that his orders were not in conflict with any applicable statute or regulation. In short, the Commissioner was the public official responsible for making these choices and he made them in a lawful manner. Accordingly, we turn to the second prong of a discretionary function exception analysis and consider whether the choices to be made were susceptible to policy analysis.
In making his decisions, the Commissioner was required to evaluate and reconcile in some manner the findings of the Philadelphia and Cincinnati laboratories. Among other things, this would include making a judgment about the significance of the fact that no segment of the first two grapes had been reserved for confirmatory testing. Moreover, the significance of this data had to be judged in the overall context of the reports to the embassy in Santiago, the surveillance activity that had already been conducted, the probability that contaminated grapes, if they existed, would be consumed, and probable consequences of any such consumption to the person poisoned, fruit consumers in general, and to the fruit industry as a whole.
A critical part of the policymaking process was the Commissioner’s decision to make a decision in the early morning hours of March 13, rather than to await more surveillance and testing. If he had waited, the plaintiffs might not have suffered the injury of which they complain. Of course, the Commissioner did not wait and, unfortunately, that injury did occur. The point, however, is that the decision about when the data were sufficient to permit responsible decisionmaking involved questions of “social, economic, and political policy.” Varig Airlines, 467 U.S. at 814, 104 S.Ct. at 2765. That decision was an inherent part of the policymaking process and just as susceptible of being skewed by the prospect of judicial second guessing as any other part of the process. Thus, the Commissioner’s decisions both involved an element of judgment or choice, and were the kind of choices “that the discretionary function exception was designed to shield.” Berkovitz, 486 U.S. at 536, 108 S.Ct. at 1959.
C.
The plaintiffs attempt to avoid application of the discretionary function exception by looking behind the injury-causing decision and finding fault with an aspect of the data on which it may have been based. The gist of their complaint is that the FDA’s Philadelphia laboratory’s tests were negligently per *286 formed because the procedures used conformed neither to the FDA’s Regulatory Procedures Manual nor to good laboratory practices generally. Thus, the plaintiffs claim, their complaint is “based on” the behavior of the laboratory technicians and not on the FDA Commissioner’s decisions to bar fruit from Chile and to remove it from the marketplace. The methods employed by the laboratory technicians while testing the grapes, they argue further, did not involve “the permissible exercise of policy judgment,” Berkovitz, 486 U.S. at 537, 108 S.Ct. at 1959, and accordingly were not themselves protected by the discretionary function exception.
We acknowledge that simply as a matter of semantics, it is possible to characterize the plaintiffs’ claims as being “based upon” the conduct of the Philadelphia laboratory technicians. We nevertheless reject that proposed characterization because it is inconsistent with the purpose of the discretionary function exception.
The plaintiffs emphasize that this case comes to us on a grant of a motion to dismiss, and that we must accept their version of the facts as true. This is, of course, an accurate statement of the law. But the fact that we must accept the plaintiffs’ version of the facts as true does not mean that we must accept plaintiffs’ characterization of those facts. We know of no authority for the proposition that plaintiffs, by the manner in which they draft their complaints, may dictate that their claims are “based upon” one government employee’s actions and not another’s. The relevant authority is to the contrary. Cf. United States v. Neustadt, 366 U.S. 696, 703-06 & n. 13, 81 S.Ct. 1294, 1298-1300 & n. 13, 6 L.Ed.2d 614 (1961) (holding that federal law, not state law or the language of plaintiffs complaint, governs the applicability of 28 U.S.C. § 2680(h)’s retention of sovereign immunity in cases where the plaintiffs claim “arise[s] out of ... misrepresentation”); Kosak v. United States, 465 U.S. 848, 851-62, 104 S.Ct. 1519, 1522-28, 79 L.Ed.2d 860 (1984) (whether plaintiffs claim “aros[e] in respect of ... the detention of any goods or merchandise by any officer of customs” for the purposes of 28 U.S.C. § 2680(c) is an independent question of federal law the resolution of which depends on the terms and purposes of the FTCA).
The reality here is that the injuries of which the plaintiffs complain were caused by the Commissioner’s decisions and, as a matter of law, their claims are therefore “based upon” those decisions. Any other view would defeat the purpose of the discretionary function exception. In situations like this where the injury complained of is caused by a regulatory policy decision, the fact of the matter is that there is no difference in the quality or quantity of the interference occasioned by judicial second guessing, whether the plaintiff purports to be attacking the data base on which the policy is founded or acknowledges outright that he or she is challenging the policy itself.
If plaintiffs injured by regulatory policy decisions were permitted to prosecute damage actions by challenging the manner in which the underlying data was collected, federal courts, of necessity, would be required to examine in detail the decisionmaking process of the policymaker to determine what role the challenged data played in the policymak-ing and what the policymaker’s decision would have been if he or she had received the unchallenged data but not the challenged data (or had received other data in lieu of the challenged data). Without such an examination and all of the discoveiy that would necessarily precede it, a plaintiff in the position of these plaintiffs would be unable to prove a causal link between the alleged negligence and the alleged injury. Yet this is precisely the kind of inquiry that the Supreme Court sought to foreclose when it ruled out any inquiry into an official’s “subjective intent in exercising the discretion conferred by statute or regulation.” Gaubert, 499 U.S. at 325, 111 S.Ct. at 1275.
The social cost of permitting the inquiries required by the plaintiffs’ theory are prohibitive. First, because the liability-creating decision might be a policy choice at the very highest level of a regulatory agency, the number of persons affected by the decision is potentially staggering and the potential liability virtually unlimited. Second, because of the nature of the inquiry, the demands of the litigation process on the most valuable hu *287 man resources of the regulatory agency will be extraordinary. But this is only a part of the picture.
As we have earlier suggested, every policy decision involves an exercise of the policymaker’s judgment about the reliability, adequacy, and significance of the information available to him or her. Because of time and expense constraints and because experience teaches that human beings make mistakes in technique, perception, logic, communication, and a myriad of other areas, no decisionmaker can have one hundred percent confidence in the information before him or her at any given point in time. Each responsible decision therefore necessarily reflects the deci-sionmaker’s judgment that it is more desirable to make a decision based on the currently available information than to wait for more complete data or more confirmation of the existing data.
When one appreciates that virtually all policymaking involves judgments about the reliability of the available data, it is not difficult to predict the impact upon policymakers that would result from the fear of virtually unlimited liability and the prospect of virtually interminable litigation associated with the plaintiffs’ theory of liability. The “safest” course from the decisionmaker’s personal perspective will be to wait for more conclusive data. But that course can carry a very high social cost. This is graphically illustrated by asking what will happen the next time a Commissioner of the FDA has to make decisions like those here involved if the current Commissioner is exposed to this litigation and the United States government is found liable for all the losses here alleged. We believe the discretionary function exception was intended to make sure every Commissioner’s judgment will not be skewed by such considerations.
D.
The plaintiffs rely principally on two Supreme Court decisions: Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), and Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). In Berkovitz, the plaintiff had contracted polio from a dose of polio vaccine. The decisions alleged to have caused the plaintiffs injury were a decision to license the manufacture of the lot from which that plaintiffs dose of vaccine came and the decision to release that lot for use by the public. The Supreme Court held that the discretionary function exception would not protect those decisions if they were contrary to a previously-established policy which left no discretion to the decisionmakers. Thus, where the policy previously established by statute and regulation deprived the agency of the authority to license a manufacturer without insisting that it submit specified data to the agency, a decision to license without requiring that submission was not a protected exercise of a discretionary function. Similarly, if a previously determined policy established objective scientific criteria for release of a lot and deprived the agency of discretion to release a lot not meeting those standards, damage liability could be imposed for a decision to release a lot not meeting those criteria.
The cases before us, unlike Berkovitz, are not eases in which the injury-causing decision was contrary to a previously established policy which deprived the decisionmaker of discretion. The policy previously established by Congress and the FDA called for the Commissioner to make a discretionary decision on whether the public health required a quarantine of Chilean fruit. The plaintiffs have pointed to no statute or regulation that the Commissioner’s decision violated. The best they can do is reach behind the Commissioner’s decision and point to a laboratory manual that allegedly called for the retention of a portion of the first two perforated, white-ringed grapes. But clearly the laboratory manual was not intended to deprive the Commissioner of the discretion to make the decision that he made on March 13 based on the information available to him at the time.
In Indian Tawing, the plaintiff had been injured as a result of the negligent operation of a lighthouse by the Coast Guard. The Court held that although the Coast Guard had no obligation to undertake lighthouse service, once it exercised its discretion to do so, it was obliged to exercise due care. The *288 Court has recently described the basis for decision in Indian Towing as follows:
The United States was held liable ... because making sure the light was operational “did not involve any permissible exercise of policy judgment.” ... Indeed, the Government did not even claim the benefit of the exception but unsuccessfully urged that maintaining the light was a governmental function for which it could not be liable.
United States v. Gaubert, 499 U.S. at 326, 111 S.Ct. at 1275.
The plaintiffs argue that just as the government, after making the discretionary decision to provide lighthouse services, could not thereafter provide those services negligently, so too the government here, after making a discretionary decision to test incoming Chilean fruit, could not thereafter fail to exercise care in doing the testing. Besides the fact that the discretionary function exception was not at issue in Indian Towing, the plaintiffs miss the critical distinction between that case and this. The plaintiff in Indian Towing was injured by the negligently performed lighthouse services and his case accordingly required an inquiry only into how those services were delivered, not into the exercise of policymaking discretion. Here the plaintiffs would not have been injured but for the decisions of the Commissioner and litigation of their cases will require extensive inquiry into the process by which those decisions weré made. Once a policy decision has been made negligence in its non-diseretionary execution can give rise to FTCA liability without jeopardizing the interests the discretionary function exception is designed to protect. Those interests would be jeopardized, however, by allowing these plaintiffs to go forward. Cf. Patterson v. United States, 881 F.2d 127, 128 (4th Cir.1989) (in banc) (holding that plaintiffs may not base claim on the non-diseretionary action of an Office of Surface Mining (“OSM”) inspector because that action was followed by a decision by the OSM not to take further action).
III.
For the foregoing reasons, we will affirm the order of the district court dismissing the complaints in these cases.

. The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-394, provides that the Commissioner of the FDA may “cause to be disseminated information regarding food, drugs, devices, or cosmetics in situations involving, in the opinion of the [Commissioner], imminent danger to the health or gross deception of the consumer.” 21 U.S.C. § 375(b); see also 21 C.F.R. § 2.5(a). FDA regulations also permit the Commissioner of the FDA to initiate a “recall” of food in distribution channels where the food presents a risk of injury to consumers and recall is needed to protect the public health. 21 C.F.R. § 7.45; see 21 C.F.R. §§ 7.40-7.59. Whether and when to initiate a recall in any particular case is a judgment call for appropriate FDA officials to make in light of the perceived "urgen[cy]” of the situation. 21 C.F.R. § 7.40(b). Thus, whether recall is warranted is assessed in light of “the degree of seriousness of the health hazard” and “the likelihood of occurrence of the hazard.” 21 C.F.R. § 7.41(a)(4), (5).