**B.H. McDANIEL, and Louise McDaniel Banks**

v.

**UNITED STATES of America.**

**Civ. A. No. 9:95 CV 58.**

United States District Court,
E.D. Texas,
Lufkin Division.

Sept. 18, 1995.

John C. Fleming, James R. Cornelius, Lufkin, Texas, Paul M. Seby, Mountain States Legal Foundation, Denver, CO, for plaintiffs.

Ruth Harris Yeager, U.S. Attorney's Office, Tyler, Texas, Paul F. Figley, Brenda M. Green, U.S. Dept. of Justice, Torts Division, Washington, DC, for defendant.

## MEMORANDUM AND ORDER

HANNAH, District Judge.

Before the court is the Motion to Dismiss the United States pursuant to Fed.R.Civ.P., 12(b)(1), and 12(b)(6), alleging that the court lacks subject matter jurisdiction over the United States and that Plaintiffs have failed to state a claim upon which relief can be granted.[1]  For the reasons given below, the court finds that the Motion is well taken and should be GRANTED.

---

**1.** Defendant also states that its motion is brought pursuant to 12(b)(2).  However, the motion does not address a claim for dismissal for lack of personal jurisdiction.

## I. BACKGROUND

Plaintiffs, B.H. McDaniel and his sister, Louise McDaniel Banks, brought suit under the Federal Tort Claims Act ("FTCA") alleging damages to their property as a result of a Southern Pine Beetle infestation which spread onto their property from the adjacent Indian Mounds Wilderness Area ("IMWA") of the National Forest in Sabine County, Texas. Plaintiffs allege that the United States, through the Department of Agriculture, United States Forest Service ("USFS") knew, or should have known, of the hazards to Plaintiffs' land posed by the Southern Pine Beetle infestation in the IMWA and negligently failed to eliminate the hazard or issue warnings to Plaintiffs. Jurisdiction is claimed pursuant to the FTCA, 28 U.S.C. §§ 1346(b), 2671 *et seq.*

The government moved to dismiss the suit for lack of subject matter jurisdiction on the ground that the agency actions fell within the discretionary function exception of the FTCA and that Plaintiffs have failed to allege a duty owed to them by the United States under state law, a prerequisite to suing under the FTCA.

## II. FACTS

Plaintiffs are owners of approximately 100 acres of timberland in Sabine County, Texas, adjacent to the IMWA, which is owned and managed by the Department of Agriculture, USFS. During 1992 and 1993, *Dendroctonus frontalis,* commonly known as the Southern Pine Beetle ("SPB"), destroyed over 12,000 acres of pine forest in five East Texas wilderness areas. The SPB has the capacity to spread rapidly. Their infestations can kill every pine in their path at a rate of up to 50 feet per day. During SPB outbreaks, a significant percentage of timber losses occur in large, expanding infestations called "hot spots" which are the primary target of SPB control tactics.

Plaintiffs contend that Defendant's policy permits the buildup of explosive SPB spots within wilderness areas before an infestation reaches the quarter mile boundary adjacent to private land and that at such an intensity, these spots are impossible to control. During June and July, 1992, SPB spots were being monitored and charted by the USFS and came within the quarter mile zone relative to Plaintiffs property. Plaintiffs' private forester discovered a large infestation spreading from the IMWA onto Plaintiffs' land and began preventive control measures on Plaintiffs' property to mitigate the losses. These measures failed and the damages to Plaintiffs' land amounted to $106,956.00.

Among the specific acts of negligence which Plaintiffs allege are the following: permitting the SPB to spread in uncontrollable size and intensity within the IMWA, permitting the SPB infestations to migrate onto Plaintiffs' adjacent land, failure to carry out Defendant's own SPB control program pursuant to the Environmental Impact Statement ("EIS") and Environmental Assessment ("EA"), and failure to warn Plaintiffs.

## III. DISCUSSION

The United States moves to dismiss Plaintiffs' claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. On a 12(b)(1) motion, challenging the jurisdiction of the court, the burden lies with the party invoking the court's jurisdiction. *Thomson v. Gaskill,* 315 U.S. 442, 62 S.Ct. 673, 86 L.Ed. 951 (1942). In evaluating whether subject matter jurisdiction exits, the court accepts all uncontroverted, well-pleaded factual allegations as true. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court may freely consider extrinsic materials submitted by the parties to satisfy itself that jurisdiction is proper because "a court may not ... extend its jurisdiction where none exists," *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 818, 108 S.Ct. 2166, 2179, 100 L.Ed.2d 811 (1988). Rule 56 summary judgment standards are inapplicable to such an inquiry. *See Osborn v. United States,* 918 F.2d 724 (8th Cir.1990).

*The State Law Claims*

Defendants assert that Plaintiffs have failed to allege a duty owed to them under the laws of Texas. The Fifth Circuit has recently affirmed that the FTCA requires a state law duty. The FTCA makes the United States liable in tort "in the same manner

and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674 for certain damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

Defendants assert that because the Indian Mounds Wilderness Area is not subject to regulation by the state of Texas, the United States cannot be held liable under Texas Statutes. § 135b–6 Texas Codes Annotated, commonly known as the Texas Structural Pest Control Act, provides that each owner of forest land shall control the forest pests on land owned by him or under his direction. The United States argues that the United States Forest Service is bound by federal law which has precedence over state statutory law. The Constitution of the United States provides that "Congress shall have the power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const., Art. IV, § 3, cl. 2. In *Kleppe v. New Mexico,* 426 U.S. 529, 539, 96 S.Ct. 2285, 2291, 49 L.Ed.2d 34 (1976) the Court stated that Congress' complete authority over the public lands included the power to regulate and protect the wildlife living there.

■ Defendant may be correct that if sued directly under the Texas Pest Control Act, the United States could claim exemption due to the hierarchy of laws theory, but that analysis begs the question here. The proper question, in the court's view, is whether the United States "*if a private person,* would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (emphasis added). It is clear that, if a private person, the United States could be held liable under Texas statutory law which imposes a duty upon owners of forest land to control forest pests on land owned by him or under his direction. *See, Johnson v. Sawyer,* 47 F.3d 716, 728 (5th Cir.1995). Accordingly, the court finds that the Government's motion to dismiss for failure to state a duty is not well taken.

*The Discretionary Function Exception*

■ The Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) *et seq.,* is a limited waiver of the government's sovereign immunity which is subject to jurisdictional exceptions and exclusions. These exceptions and exclusions must be strictly construed in favor of the United States. *Atorie Air. v. F.A.A.,* 942 F.2d 954, 958 (5th Cir.1991). The foremost exception is the "discretionary function" exception, § 2680(a) which provides that there shall be no liability under the FTCA on

> [a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved is abused.

The United States claims that the acts and omissions complained of by Plaintiffs are discretionary functions which fall within the exception. Plaintiffs claim that the acts and omissions are not of the type of conduct protected because the USFS operational personnel failed to follow the USFS's own procedures in the IMWA. Plaintiffs claim that the USFS's course of conduct was specifically prescribed by established procedures and that the USFS field personnel had no discretion to deviate from the prescribed procedures.

After the Federal Tort Claim Act was passed as part of the 1946 Legislative Reorganization Act, the United States Supreme Court reviewed its first discretionary function case, *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). In *Dalehite* 8500 plaintiffs sought $200 million in damages as a result of the explosion of two ships loaded with fertilizer-grade ammonium nitrate in Texas City, Texas. The plaintiffs claimed negligence in the manufacture, bagging, shipping and storage of the ammonium nitrate, which was destined for the European recovery program, and negligent firefighting by the Coast Guard. The Court held that discretion included more than the initiation of programs. "Where there is room for policy judgment and decision there is discretion.

It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." *Id.* at 36, 73 S.Ct. at 968. The Court concluded that the challenged decisions were "responsibility made at a planning rather than operational level." *Id.* at 42, 73 S.Ct. at 971.

In *United States v. Varig Airlines,* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), a case dealing with regulation of the airlines, the Court held that while it was impossible and unnecessary to define with precision "every contour" of the discretionary function exception, "it is the nature of the conduct, rather than the status of the actor" that governed. *Id.* at 813, 104 S.Ct. at 2764. The Court further held that Congress's objective in § 2680(a) was to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814, 104 S.Ct. at 2765.

In 1988 the Court attempted to clarify the scope of the discretionary function exception in *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) which arose when an infant plaintiff contracted a disabling case of polio after being administered an oral polio vaccine. Negligence was alleged on the part of the Division of Biologic Standards of the National Institutes of Health and The Food and Drug Administration in the licensing and releasing the vaccine manufactured by Lederle Laboratories. The Court articulated a two-step procedure to guide courts in analyzing the exception's scope. First a court must consider "whether the action is a matter of choice for the acting employee" or whether it is specifically prescribed by a federal statute, regulation, or policy *Id.* at 536, 108 S.Ct. at 1958. The protection of the discretionary function exception would not apply "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* The second factor, assuming that the employee was allowed to exercise judgment, was "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* Only

judgments based "on considerations of public policy" are protected.

This two part *Berkovitz* test was applied by the Court in *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), a case dealing with government intervention in the running of a purportedly unstable savings and loan. The complained of actions consisted of a combination of general advice on the running of the institution and some closer involvement in the day-to-day business decisions. The Court made two inquiries: 1.) Has judgment been controlled by a statute, regulation, or policy? and 2.) Even if discretion remains with the federal official, is the judgment of the kind section 2680(a) was meant to protect? *Id.* at 321–23, 111 S.Ct. at 1273–74. The Court identified three situations involving the presence of statutes, regulations, or policies. In the first situation the law mandates particular conduct and the government officer or employee obeys the law. Here § 2680(a) applies "because the action will be deemed in furtherance of the policies which lead to the promulgation of the regulation." *Id.* at 323, 111 S.Ct. at 1274. In the second situation, the law mandates particular conduct and the officer or employee violates the law. Here, § 2680(a) does not shelter the government from liability "because there is no room for choice and the action will be contrary to policy." *Id.* In the third situation, the law allows the officer or employee to exercise discretion. In this case, "the very existence of the regulation creates a strong presumption that the discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Id.* *Gaubert* goes on to state that to avoid dismissal a plaintiff "must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Id.* at 324, 111 S.Ct. at 1275. That is determined not by the officer's "subjective intent ... but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.*

Plaintiffs herein assert that this case presents facts analogous to the second situation in *Gaubert,* i.e., the law mandates a particu-

lar conduct and the officers or employees violate the law. Applying the *Berkovitz* precedent to these facts, Plaintiffs allege that the actions which were mandated by the Environmental Assessment ("EA") and the Technical Assistance Report ("TAR") specifically prescribed a course of action for the Forest Service employees to follow, over which they had no choice, and which they negligently performed or failed to perform, resulting in damage to Plaintiffs' land.

In reviewing the documents submitted by the parties hereto, the court notes that the policy of the United States Department of Agriculture, United States Forest Service, which was in place during June and July, 1992, the time when Plaintiffs allege the negligence of the United States, was the Record of Decision ("ROD") published April 6, 1987. The United States Forest Service's determination of whether or not to control Southern Pine Beetle infestation in the wilderness and its attendant policy is embodied in this document, entitled "Record of Decision, USDA Forest Service, Suppression of the Southern Pine Beetle, Final Environmental Impact Statement." Page one of the ROD indicates that the USFS has considered various alternatives and decided to implement alternative 4. It states:

> "The decision to implement alternative 4 *permits but does not require* control of SPB infestations in wilderness. Alternative 4 offers the 'no control' option and it is this option that will be exercised most often to allow natural forces to play their role in the wilderness ecosystem. It is only when these natural forces are predicted to threaten an essential RCW[2] colony or cause unacceptable damage to specific resources adjacent to the wilderness that control in wilderness *may* be taken" (emphasis added).

The ROD goes on to state that stringent new criteria for determining the need for control in wilderness are clarified and they "reflect the Forest Service's awareness of the importance of allowing natural process to occur in wilderness."

These criteria *permit* control only in the 1/4–mile zone along the wilderness boundary; protect only those RCW colonies in wilderness that have been identified as "essential" by the Fish & Wildlife Service; . . . and requires an assessment of the threatened resource, management objectives of the affected State and private landowners and threat of SPB to these lands from nonwilderness sources *before a decision is made on whether or not to control*" (emphasis added).[3]

The ROD goes on to state that by implementing an alternative that will allow the natural process of most SPB infestations to occur uninterrupted in wilderness, and by employing control action only under the most stringent conditions, the Forest Service declares its intention to manage each wilderness to insure that wilderness character and values are dominant and enduring.[4]

In deciding to implement alternative 4, the Chief of the USFS states in the ROD that "control of individual SPB infestations will not be conducted unless the site-specific analysis, including a biological evaluation of the individual infestation, indicates that the spot(s):

> —will likely threaten the continued existence of an essential RCW colony site and foraging area.
> —occurs within 1/4 mile of susceptible host type on State and private land or high-value Federal forest resources other than commercial timber."[5]

The ROD states that in addition to the above circumstance "for which control would be considered, *all* the following additional conditions must be met before an infestation may be controlled in wilderness" (emphasis in original). With reference to adjacent State and private lands and high-value Federal resources other than commercial timber:

> The SPB spot growth model predicts the spot would spread across the wilderness

---

2. Red Cockaded Woodpecker, an endangered species.

3. ROD, page 1.

4. ROD, page 2.

5. ROD, page 12.

boundary and cause unacceptable damage.... The Forest Service will use a site-specific analysis to judge whether there is a threat of unacceptable damage to the resources on adjacent lands.... Control action would be taken only when there is reasonable assurance of accomplishing control objective.[6]

The ROD goes on to state that the six federal laws pertain to the alternative selected, including The National Environmental Policy Act, 42 U.S.C. 4321, *et seq.*, The Wilderness Act, 16 U.S.C. 1131, *et. seq.*, and The Endangered Species Act, 16 U.S.C. 1531, *et seq.* It further states that the policy provides for a case by case decision on pest control in wilderness,[7] and allows "decisions to be made at the level where the specific facts are known and thus the most reasonable judgments can be made." [8]

■ On August 23, 1992, *after* the SPB infestation had already spread onto Plaintiffs' land, the USFS, Region 8, issued an Environmental Assessment which stated that there was sufficient information concerning private landowner management objectives and suppression actions to take appropriate control action within the IMWA. Regional Forester, John E. Alcock, stated his decision to implement Alternative 3, which includes the use of cut and hand spray, cut and leave, and cut and remove.

On September 11, 1992, also *after* the SPB infestation had spread onto Plaintiffs' land, David B. Drummond, a Field Office Representative of USFS sent a Technical Assistance Report ("TAR") recommending immediate application of the cut and leave control method to SPB Spot 2232 within the IMWA for the purposes of protecting adjacent private property.

Plaintiffs, in stating that USFS operation personnel failed to follow their own procedures in the IMWA, point specifically to those procedures authorized in the EA and TAR which were issued *after* the SPB infestation from Spot 2232 had already spread onto Plaintiffs' land. The Court finds these arguments, therefore, to be less than compelling.

■ In examining the language of the Record of Decision which was the policy in effect at the time of the negligence alleged, the court directs its attention to whether the "policy specifically prescribes a course of action for an employee to follow." *Berkovitz v. United States,* 486 U.S. at 536, 108 S.Ct. at 1958. The ROD states that the decision to implement alternative 4 "permits but does not require control of SPB infestations in the wilderness." [9] The ROD further states that the overall policy is to allow natural forces to play their role in the wilderness ecosystem and that only when it is predicted that these natural forces threaten an essential Red Cockaded Woodpecker Colony or threaten to cause unacceptable damage to specified resources adjacent to the wilderness that control in the wilderness *may* be taken. The ROD provided that numerous steps must be taken, including a site-specific analysis with a biological evaluation, before a decision is made on whether or not to control. *Id.* It is clear that the ROD specifically mandates a course of action to be taken before a decision of whether or not to control is made. It is not this course of conduct that the Plaintiffs herein challenge. Plaintiffs' complaint implies that this policy permitted the SPB to spread in uncontrollable size and intensity within the IMWA and ultimately onto Plaintiffs' land. However, it is clear that the ROD is a statement of administrative policy grounded in "social, economic and political policy" which the discretionary exception was designed to protect. *United States v. Varig Airlines,* 467 U.S. at 814, 104 S.Ct. at 2765.

Plaintiffs apparently complain that the United States Forest Service did not implement the "cut and leave" or "cut and remove" options on the "hot spot" adjacent to their land, provided for in alternative 3, adopted on August 23, 1992, prior to its adoption. Plaintiffs allege that the USFS was monitoring this area and cut buffers

---

**6.** ROD, page 13.

**7.** ROD, page 15.

**8.** ROD, page 27.

**9.** ROD, page 1.

around infested trees notwithstanding the absence of an Environmental Assessment for the IMWA. Plaintiffs cannot and do not point to any specific action mandated by the policy in place at the time of the alleged negligence which was violated by the United States. The argument that the USFS neglected to carry out or were negligent in carrying out a policy prior to its adoption is not persuasive.

Plaintiffs argue that the operational conduct of USFS personnel failed to follow control procedures and to adhere to standards of good practice. However, Plaintiffs do not point to the mandate in the policy which USFS personnel allegedly failed to follow.[10] Apparently, the USFS did undertake additional SPB control efforts adjacent to Plaintiffs' land by cutting a buffer strip on September 12, 1992.[11]

The essence of Plaintiffs' argument appears to be that the policy should have been changed and implemented sooner. However, "where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." *Dalehite v. United States,* 346 U.S. at 42, 73 S.Ct. at 971. It is apparent from the ROD that the Department of Agriculture had numerous factors which were considered in its decision of whether or not to try to control the Southern Pine Beetle and the attendant problems of what methods to use and where to use them. The ROD cites two district court case precedents in Texas which the USFS had to consider, five federal laws which also govern, as well as the probable challenges of numerous environmental groups. The decisions of the USFS are precisely the type of administrative policy making and implementation which Congress intended to protect from judicial second-guessing when enacting the discretionary exception embodied in § 2680(a).

**10.** Plaintiffs also complain that the USFS failed to warn them of the impending SPB infestation approaching their land from the IMWA. However, Plaintiff failed to point to the regulation or policy statement requiring this action.

## CONCLUSION

Plaintiffs have not alleged "facts which would support a finding that the challenged actions are not of the kind of conduct that can be said to be grounded in the policy of the regulatory regime" as required by *United States v. Gaubert,* 499 U.S. at 326, 111 S.Ct. at 1275, for Plaintiffs to avoid dismissal on a discretionary exception challenge. Accordingly, the court finds that the Motion to Dismiss of the United States is well taken and is hereby GRANTED. This action is DISMISSED.

Costs shall be born by the party incurring same.

**11.** Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss at page 9.