864 So.2d 473 (2004)
The CITY OF OCALA, Appellant/Cross-Appellee,
v.
Belinda Sweet GRAHAM, Appellee/Cross-Appellant.
No. 5D02-3208.
District Court of Appeal of Florida, Fifth District.
January 2, 2004.
*474 Eric P. Gifford and Patrick G. Gilligan, of Gilligan, King & Gooding, P.A., Ocala, for Appellant/Cross-Appellee.
L. Edward McClellan, Jr. of McClellan & Batsel, P.A., Ocala, for Appellee/Cross-Appellant.
PETERSON, J.
The City of Ocala (City) appeals an order denying its motions for directed verdict and judgment notwithstanding the verdict after a jury found in favor of Belinda Sweet Graham. Graham alleged that because an Ocala police officer failed to "talk" to her former husband about his *475 threat to her life, she was shot by her husband two days later.
That threat was made when Graham's estranged husband, Nathaniel Sweet, telephoned Graham's sister at her home in Anthony, Florida, telling her that she should inform Graham that he saw her friend and son riding together and that when he caught up with them he was going to kill them. Graham's sister interpreted this as a threat directed at her sister, her sister's boyfriend, and her sister's two older sons. Upon learning of the threat, Graham immediately called the Ocala Police Department (OPD).
Christopher Smith, an officer with the OPD, responded to Graham's call. Some of the details of the discussion that followed are in dispute, but we relate those that are most favorable to Graham. According to Graham and her daughter-in-law, who was allegedly present during the discussion, Officer Smith specifically stated that he was going to go speak to Sweet or would send someone to speak to him. Graham acknowledges that Officer Smith advised her to tell her sister to call the Marion County Sheriff's Office because the phone call originated and was received beyond the OPD's jurisdiction. Officer Smith wrote a report of the incident, at Graham's insistence, because she believed it would assist her later in obtaining a restraining order. She also believed that a police officer's contact with Sweet would have had a deterring effect because several past domestic disputes between Graham and Sweet had been defused by such contacts. Officer Smith filed the report detailing the meeting with Graham noting that he had told Graham that her sister, in Anthony, was the victim of the harassing phone call, that her sister needed to notify the Marion County Sheriff's office to make the report and that Graham, herself, wanted a report from the OPD because she was attempting to obtain a restraining order against Sweet. The report ended with "no further action taken."
Two days after Graham's discussion with Officer Smith, Sweet had three different telephone conversations during the course of a single day with Graham at Graham's sister's home in Anthony. According to Graham's testimony, the first thing Sweet said to her was, "Did you get my message?" Graham answered yes, she had received his message, and that he needed to leave her alone. The conversations then concerned their five year old son and whether he needed a haircut and his toys. Graham told Sweet not to bring the toys, allowed him to talk with their son and thought that she had dissuaded him from a visit. She testified that she did not call any enforcement agency, although she recognized that no one from the OPD had contacted Sweet, because that fact would have crept into the phone conversations.
Ignoring Graham's attempt to discourage the visit, Sweet drove to Graham's sister's house and as he was nearing the house, passed Graham's departing adult son, William Calloway. Calloway believed that Sweet gave him a "mean look," and having heard about the earlier alleged threat, turned his car around and returned to the house. Calloway found Sweet talking with Graham and their son outside by Sweet's truck that contained their son's toys. Calloway initiated a discussion with Sweet about the earlier threatening phone call. According to Calloway, Sweet mumbled a response, then in an outraged manner stated, "I'm going to end this right now," and proceeded to walk towards his truck. As Sweet passed, Calloway pushed Sweet and a fist fight ensued during which Calloway broke Sweet's collarbone. Sweet was also severely bruised, and bleeding from the mouth, nose and ears as a result of the fight. When the two separated, *476 Sweet ran to his truck. Suspecting that Sweet was going to retrieve some sort of weapon, Calloway began running for the woods. Sweet retrieved a handgun from his truck and shot it in Calloway's direction. One shot struck Graham in the face causing severe and permanent injuries.
Graham sued the City of Ocala alleging negligence for the alleged failure of the OPD to prevent Sweet's actions that led to her injuries. She contends that Officer Smith's failure to locate and talk to her estranged husband was the proximate cause of her injuries. The jury found the City fifteen percent negligent and Graham eighty-five percent negligent. The City's motion for judgment notwithstanding the verdict was denied and this appeal ensued.
The Florida Supreme Court in Trianon Park Condominium v. City of Hialeah, 468 So.2d 912 (Fla.1985), described five basic principles regarding governmental tort liability:
First, for there to be governmental tort liability, there must be either an underlying common law or statutory duty of care with respect to the alleged negligent conduct. For certain basic judgmental or discretionary governmental functions, there has never been an applicable duty of care. Commercial Carrier [v. Indian River County, 371 So.2d 1010 (Fla.1979)]. Further, legislative enactments for the benefit of the general public do not automatically create an independent duty to either individual citizens or a specific class of citizens. Restatement (Second) of Torts § 288 comment b (1964).
Second, it is important to recognize that the enactment of the statute waiving sovereign immunity did not establish any new duty of care for governmental entities. The statute's sole purpose was to waive that immunity which prevented recovery for breaches of existing common law duties of care....
Third, there is not now, nor has there ever been, any common law duty for either a private person or a governmental entity to enforce the law for the benefit of an individual or a specific group of individuals. In addition, there is no common law duty to prevent the misconduct of third persons. See Restatement (Second) of Torts § 315 (1964).
Fourth, under the constitutional doctrine of separation of powers, the judicial branch must not interfere with the discretionary functions of the legislative or executive branches of government absent a violation of constitutional or statutory rights. See Commercial Carrier; Askew v. Schuster, 331 So.2d 297 (Fla. 1976); art. II, § 3, Fla. Const. Judicial intervention through private tort suits... would violate the separation of powers doctrine.
Fifth, certain discretionary functions of government are inherent in the act of governing and are immune from suit. Commercial Carrier. It is "the nature of the conduct, rather than the status of the actor," that determines whether the function is the type of discretionary function which is, by its nature, immune from tort liability. Varig Airlines [United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).] (emphasis added).
Trianon Park also divided governmental functions into categories for tort liability purposes. We are concerned in the instant case with category II, the enforcement of laws and the protection of the public safety. That category does not have a common law duty of care, but sovereign immunity may disappear and liability may be imposed when a special relationship *477 exists between the government actor and the tort victim. Id. at 921; see also Everton v. Willard, 468 So.2d 936 (Fla. 1985); Laskey v. Martin Co. Sheriff's Department, 708 So.2d 1013 (Fla. 4th DCA 1998).
In Pierre v. Jenne, 795 So.2d 1062 (Fla. 4th DCA 2001), the Fourth District Court of Appeal discussed the elements necessary to establish a special relationship between law enforcement and a tort victim:
1) an express promise or assurance of assistance;
2) justifiable reliance on the promise of assistance; and
3) harm suffered because of the reliance upon the express promise or assurance of assistance.
Id. at 1064. When we accept Graham's version of what happened, as we must, the first element is established by the express promise or assurance that Officer Smith would talk to Sweet. The facts of this case, taken in the light most favorable to Graham, however, do not establish the second element of justifiable reliance on the promise of assistance. Graham could not have justifiably relied upon any promise by Officer Smith to "talk" with Sweet or that the talk would accomplish any degree of deterrent when she concluded on the first of three telephone conversations during the course of that fateful day that Officer Smith had not contacted Sweet. Although Graham had the opportunity to contact the Marion County Sheriff's Department, who had jurisdiction where the telephone conversations and subsequent tragic actions took place, she did not do so because she testified that she was not concerned about Sweet causing harm to her at the time of those telephone conversations. Cf. Brown v. City of Delray Beach, 652 So.2d 1150 (Fla. 4th DCA 1995); St. George v. City of Deerfield Beach, 568 So.2d 931 (Fla. 4th DCA 1990); Hartley v. Floyd, 512 So.2d 1022 (Fla. 1st DCA 1987). Further, the third element was not established in this case because the harm suffered was not because of Graham's alleged reliance upon Officer Smith's commitment to talk with Sweet; the harm resulted from Graham's failure to contact the proper law enforcement official for protection combined with Calloway's hostile action directed toward Sweet.
Moreover, we find that as a matter of law, Officer Smith's actions, or more precisely, inaction, was not the proximate cause of Graham's injuries. The determination of proximate cause is normally conducted by the fact finder, in this case, the jury. McCain v. Florida Power Corp., 593 So.2d 500 (Fla.1992), explains the duties of the jury and court in determining whether a specific fact situation is the proximate cause of the harm:
In the past, we have said that harm is "proximate" in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question. In other words, human experience teaches that the same harm can be expected to recur if the same act or omission is repeated in a similar context. Cone v. Inter County Tel. & Tel. Co., 40 So.2d 148, 149 (Fla. 1949). However, as the Restatement (Second) of Torts has noted, it is immaterial that the defendant could not foresee the precise manner in which the injury occurred or its exact extent. Restatement (Second) of Torts § 435 (1965). In such instances, the true extent of the liability would remain questions for the jury to decide.
On the other hand, an injury caused by a freakish and improbable chain of events would not be "proximate" precisely because it is unquestionably unforeseeable, *478 even where the injury may have arisen from a zone of risk. The law does not impose liability for freak injuries that were utterly unpredictable in light of common human experience. Thus, as the Restatement (Second) of Torts has noted, a trial court has discretion to remove the issue from the jury if, "after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that [the conduct] should have brought about the harm." Restatement (Second) of Torts § 435(2) (1965).
Unlike in the "duty" context the question of foreseeability as it relates to proximate causation generally must be left to the fact-finder to resolve. Thus, where reasonable persons could differ as to whether the facts establish proximate causationi.e., whether the specific injury was genuinely foreseeable or merely an improbable freakthen the resolution of the issue must be left to the factfinder. Vining v. Avis Rent-A-Car Systems, Inc., 354 So.2d 54, 56 (Fla. 1977); Florida Power & Light Co. v. Bridgeman, 133 Fla. 195, 182 So. 911 (1938). The judge is free to take this matter from the fact-finder only where the facts are unequivocal, such as where the evidence supports no more than a single reasonable inference. Tatom v. Seaboard Air Line Ry. Co., 93 Fla. 1046, 113 So. 671 (1927).
Id. at 504 (footnote omitted).
It is with the guidance supplied by McCain that we must determine whether the trial court properly submitted to the jury the question: "Whether but for Officer Smith's failure to talk with Sweet, Graham would not have been harmed." A reasonable person could not answer that question affirmatively unless sheer speculation was enlisted when one reviews the facts of this case cast in a light most favorable to Graham.
Officer Smith explained to Graham that no arrest was possible by the OPD because Sweet's threats were not made within the jurisdiction of the OPD, no crime had been committed and Graham's sister was the proper complainant. Graham knew that the OPD could not take Sweet into custody, that the Marion County Sheriff's Department was the appropriate authority and the most that Officer Smith could do was talk with Sweet. Graham's speculation that Sweet's disposition would change as it had after law enforcement officers had talked to him in the past appears to be the primary factor relied upon by Graham in establishing an issue for jury determination. Whether a discussion between Sweet and a police officer would have caused the dissipation of Sweet's predisposition to carry out the threat is an unanswerable question. We also note that Graham's speculation was not a logical or reliable conclusion in view of the repeated disturbances and arrests that occurred subsequent to "talks" that took place in the past during the couple's stormy marriage.
Graham realized that the OPD had made no contact with Sweet two days after she met with Officer Smith. The absence of contact became clear to her during the first of three separate phone conversations with Sweet during which she discussed matters about their son and allowed Sweet to talk with their son on the phone. Graham did not feel threatened in her telephone conversations with Sweet and made no attempt to call the Marion County Sheriff's Department when Sweet told her that he wanted to visit with and bring toys to their son. Sweet's later arrival with their son's toys and his conversation with Graham did not indicate any life-threatening hostility. It was not until Calloway returned, initiated conversation about the *479 alleged earlier threat and physically attacked Sweet that the catalyst was supplied for the events resulting in the terrible injuries to Graham. It is our view that a reasonable person looking back from the event that injured Graham must conclude that Officer Smith's failure to talk with Sweet did not bring about the harm in question. Additionally, Calloway's physical attacks upon Sweet served as superseding and intervening causes of the injuries inflicted upon Graham. See, e.g., Levy v. Florida Power & Light Company, 798 So.2d 778 (Fla. 4th DCA 2001); Metropolitan Dade County v. Tribble, 616 So.2d 59 (Fla. 3rd DCA), review denied, 626 So.2d 210 (Fla.1993); Derrer v. Georgia Electric Company, 537 So.2d 593 (Fla. 3rd DCA 1988), review denied, 545 So.2d 1366 (Fla.1989); Metropolitan Dade County v. Colina, 456 So.2d 1233 (Fla. 3rd DCA 1984).
We reverse the trial court's denial of the directed verdict and judgment notwithstanding the verdict and remand for entry of judgment for the City.
REVERSED.
PALMER and TORPY, JJ., concur.