COHEN, J.
 

 We review the trial court’s summary final judgment in this wrongful death lawsuit brought by Appellants, Roger R. Olson and Sherry R. Olson, as Personal Representatives of the Estate of Timothy F. Olson, who drowned during the installation of a floating dock on Walt Disney World property. Because a genuine issue of material fact exists regarding proximate causation, we reverse and remand for further proceedings.
 

 Timothy Olson was employed by SD Watersports, LLC, a water sports concession owned and operated by Sammy Du-vall, which is located on Bay Lake on the grounds of Disney’s Contemporary Resort. SD Watersports contracted with Crowell Plumbing & Heating for an EZ Dock floating dock system to facilitate the rental of personal watercraft. Because SD Waters-ports was not experienced in assembling an EZ Dock floating dock system, Duvall and Crowell agreed that Crowell’s employee, Rodney Maggiacomo, would oversee the installation for $200 a day, show the SD Watersports employees how to do it, and provide all the tools and equipment.
 

 Because certain dock sections were unavailable, Crowell arranged for the delivery of the available sections to the Contemporary Resort. Had all sections been present, the entire dock could have been assembled on dry land. Maggiacomo and several SD Watersports employees assembled the dock sections, and Disney’s ferry lift placed it in the lake. Maggiacomo explained that when the two missing sections arrived, a coupler installation tool would allow them to complete the dock without anyone getting in the water. When the last sections arrived, however, the coupler installation tool was on back order and unavailable.
 

 Despite a last-minute effort to locate another source for the tool, Maggiacomo returned to the resort knowing that the only way to finish assembling the dock was for someone to go underwater, and under the dock, to hold the couplers in place. Robert Crowell described the procedure: first, swim underneath the dock with a bottom coupler and connecting rod attached, then push the coupler up through an opening until someone on top of the dock fastens the top coupler with a nut, all while holding your breath for up to two minutes. Crowell acknowledged a safety issue in going underneath the dock for coupler installation. He never directed his own employees to go underwater to perform this assembly; only he had done it. Duvall also conceded that it was dangerous to swim underneath a floating dock.
 

 It is unclear whether Maggiacomo, or Scott Wester, who was in charge of SD Watersports’ operations, gave the go-ahead, but it was clear that Duvall was unwilling to wait a month for the coupler installation tool to be delivered, and Olson was under pressure from Duvall to complete the dock and get the Jet Ski operation running. In any event, a group comprised of SD Watersports employees,
 
 *141
 
 Timothy Smith, a parasail boat captain, Olson, a water skier, Jeffrey Green, a par-asail boat driver, and Maggiacomo, a plumber’s apprentice with Crowell Plumbing, worked together to complete the final assembly without the coupler installation tool.
 

 The dock floating system was large— seventy feet long by fifteen-and-a-half feet wide. Eight top and bottom coupler sections needed to be connected to assemble the remaining pieces. Four were connected without going in the water, but the remaining four required someone to go underneath the dock. Olson volunteered to get in the water and donned a wetsuit and mask, but no SCUBA gear. It was early March, the water was cold and the visibility extremely poor. The water’s depth under the dock was eight to ten feet.
 

 Maggiacomo, Smith, and Green, who were on the dock, told Olson that they would knock on the dock to alert him to surface after a coupler was secured. Using this procedure, Olson managed to get two couplers connected. With only two couplers remaining to be connected, Smith got in the water to assist. What happened next is unclear. According to Smith, as he finished the last couplers, he saw Olson swimming next to him, then swimming away. Smith heard Olson swimming and tapping along the dock. A few minutes later he got out of the water and realized he no longer heard Olson. Those on the dock gave a slightly different version. When the last coupler was connected, the men knocked, but Olson did not surface. Maggiacomo was immediately concerned, but the others thought Olson might be fooling around and were not concerned for another few minutes. Smith and Green swam around the dock looking for Olson as several more minutes passed.
 

 A call to Disney’s Lake Patrol brought several rescue personnel, and a SCUBA diver eventually located Olson’s body near where he was last seen. Olson was not breathing and his body was lifeless. Despite attempts to resuscitate Olson, he arrived at the hospital in a “flat line” state, meaning no electrical activity, and was pronounced dead shortly thereafter.
 

 Appellants filed a lawsuit alleging the various Appellees were negligent in proceeding with an illegally unpermitted floating dock installation, failing to exercise reasonable care in doing so without the required tool, and failing to conduct the project in a reasonably careful and prudent manner by permitting the inexperienced Olson to go underwater and engage in the extremely dangerous activity. Discovery ensued, focusing on criticisms related to marine engineering and construction and the manner in which the construction project was handled. Appellants’ expert witnesses leveled significant criticisms about the lack of a required permit, use of inexperienced workers without proper SCUBA gear for underwater assembly, lack of appropriate supervision, failure to maintain any underwater communication or connection with Olson, and the lack of any protocol to trigger a quick response in case of emergency. To support their claims, Appellants utilized a Reedy Creek Improvement District deputy building official and an expert in the field of marine engineering and construction. The building official testified that a permit was required for the dock project and that the permit required two sets of drawings, plus permit application from a licensed general contractor or specialty contractor.
 

 Just weeks before trial, the focus shifted from permitting and supervision issues when Dr. Anderson, Orange County Deputy Chief Medical Examiner, was deposed about his autopsy results. Dr. Anderson’s autopsy reported that the cause of death was “drowning,” with findings of acute pul
 
 *142
 
 monary edema, multiple granulomas in the lungs and spleen consistent with sarcoido-sis, prominent right ventricular hypertrophy consistent with an enlarged heart, and acute cerebral edema. In his deposition, he explained that the disease sarcoidosis is characterized by small granulomas that appear, as shown in Olson’s case, in the lungs, creating pulmonary hypertension. This condition meant that Olson was experiencing abnormally high blood pressure in the pulmonary arteries, which, over time, caused the right ventricle of his heart to thicken and enlarge, called cor pulmonale. He opined that the condition can lead to the development of, or contribute to, cardiac arrhythmias and that unrecognized pulmonary hypertension is well recognized as a cause of sudden death. Further, he speculated:
 

 Now an arrhythmia, development of an arrhythmia is compounded by anything that causes decreased oxygenation to the muscle that sort of sensitizes it. Sometimes drug use, hypoxia. I would speculate, and it’s purely speculation, that while underwater he was becoming somewhat hypoxic, particularly if he did not have an oxygen source.... He could have become somewhat hypoxic or had decreased oxygen in the blood in his condition that might have lead to more [sic] propensity to have an arrhythmia.
 

 Appellees joined in a motion for summary judgment, arguing that, even assuming that one or more of them breached a duty owed Olson, Appellants’ case failed due to a lack of causation and foreseeability, with regard to the cause of Olson’s death, based upon the “uncontroverted testimony” of the medical examiner.
 
 [1]
 

 Two days prior to the summary judgment hearing, Appellants served Appellees with an affidavit in which Dr. Anderson clarified his deposition testimony. He averred:
 

 First, it is my opinion that within a reasonable degree of medical probability that Timothy M. Olson became hypoxic as a result of holding his breath while underwater during the process of working on. the floating dock on March 8, 2002.
 

 Second, it is my opinion within a reasonable degree of medical probability that the sole cause of Mr. Olson’s hypoxia at that time and place was Mr. Olson holding his breath under the water during the process of working on the floating dock.
 

 Third, it is my opinion within a reasonable degree of medical probability that the hypoxia caused a cardiac arrhythmia in Mr. Olson, which caused Mr. Olson to drown.
 

 Fourth, it is my opinion based within a reasonable degree of medical probability that if Mr. Olson’s distress underwater at the dock had been detected within three to five minutes, and appropriate CPR instituted, that Mr. Olson’s arrhythmia would have been corrected and he probably would have survived and this would not have been a fatal event. Fifth, it is my opinion that if Mr. Olson had sustained this arrhythmia not underwater but above the water that it is probable the arrhythmia would have self-corrected and he would have survived.
 

 The trial court, after a hearing, granted summary final judgment in favor of Appel-lees. It ruled that the evidence of record only supported a single reasonable inference: the cause of Olson’s death was the
 
 *143
 
 previously unknown and undetected sarcoi-dosis disease. The trial court concluded that reasonable persons could not differ on the issue, and Appellees were entitled to judgment as a matter of law.
 

 This court reviews de novo the grant of summary judgment on the issue of proximate causation.
 
 Volusia County v. Aberdeen at Ormond Beach, L.P.,
 
 760 So.2d 126, 130 (2000). The movant for summary judgment has the initial burden of demonstrating the nonexistence of any genuine issue of material fact, but once he tenders competent evidence to support his motion, the opposing party must come forward with counterevidence sufficient to reveal a genuine issue.
 
 Landers v. Milton,
 
 370 So.2d 368, 370 (Fla.1979). The issues of negligence and probable cause are ordinarily questions for the jury if reasonable men can arrive at different conclusions, but these issues become questions of law if the facts point to but one possible conclusion.
 
 Cassel v. Price,
 
 396 So.2d 258, 260 (Fla. 1st DCA 1981).
 

 “The circumstances under which a court may resolve proximate cause as a matter of law are extremely limited.”
 
 Lindsey v. Bell S. Telecomms., Inc.,
 
 943 So.2d 963, 966 (Fla. 4th DCA 2006). “If reasonable people could differ as to whether the facts establish proximate causation (i.e., whether the specific injury was genuinely foreseeable or an improbable freak occurrence), the issue must be left to the fact finder.”
 
 Id.,
 
 citing
 
 Goldberg v. Fla. Power & Light Co.,
 
 899 So.2d 1105, 1116 (Fla.2005);
 
 St. Fort v. Post, Buckley, Schuh & Jernigan,
 
 902 So.2d 244, 250 (Fla. 4th DCA 2005); accord
 
 City of Ocala v. Graham,
 
 864 So.2d 473, 478 (Fla. 5th DCA 2004). This court explained:
 

 [A]n injury caused by a freakish and improbable chain of events would not be “proximate” precisely because it is unquestionably unforeseeable, even where the injury may have arisen from a zone of risk. The law does not impose liability for freak injuries that were utterly unpredictable in light of common human experience. Thus, as the Restatement (Second) of Torts has noted, a trial court has discretion to remove the issue from the jury if, “after the event and looking back from the harm to the actor’s negligent conduct, it appears to the court highly extraordinary that [the conduct] should have brought about the harm.” Restatement (Second) of Torts § 435(2) (1965).
 

 Graham,
 
 864 So.2d at 477-78.
 

 The crux of the trial court’s opinion was that Olson’s death from a “fatal arrhythmia” was unforeseeable and that the cause of his death “supports no more than a single reasonable inference — a previously unknown, undetected disease.”
 

 Although Appellees and the trial court characterize the arrhythmia Olson experienced as “malignant” or “fatal,” the medical evidence does not support this conclusion. Dr. Anderson opined that the sole cause of Olson’s hypoxia was from holding his breath while underwater at the dock, and the hypoxia, in turn, caused a cardiac arrhythmia, which caused him to drown. Further, had his distress been detected, and appropriate CPR administered within three to five minutes, Dr. Anderson believed that he would have survived. Not only did Dr. Anderson predict survivability upon rescue, but he also opined that had the arrhythmic incident occurred above water, that it was probable that the arrhythmia would have self-corrected. Dr. Anderson’s opinions are not susceptible of an exclusive judgment that Olson’s death was solely due to his disease.
 

 The trial court also reached conclusions of law disputing Appellants’ allegations that the project was not handled in an “appropriate and legal manner.” It con-
 
 *144
 
 eluded that there was no evidence that there were requirements describing “appropriate” means of assembling the dock. We take issue with this conclusion. The evidence demonstrates that Appellees, faced with the temporary unavailability of the specially designed coupler tool and the perceived need to expedite the project, decided to proceed with an admittedly dangerous procedure. Further, in so proceeding, the inherent risks of completing the project were not lessened by careful supervision and monitoring of the underwater assembly. The trial court has taken this issue away from the factfinder in concluding there was no evidence of the “appropriate” means of assembling the dock.
 

 Appellees’ motion for summary judgment assumed a breach of duty and asserted that there was nevertheless no proximate causation. The trial court concluded as a matter of law that there was “no evidence of any breach of duty with respect to monitoring or supervision, or assuming there was such a duty, that its breach proximately caused Mr. Olson’s death.” We disagree. Based on the evidence, a jury might conclude that Appellees’ failure to monitor or maintain communication with Olson during the underwater assembly breached a duty to supervise him.
 

 We acknowledge that there are freakish accidents for which the law does not impose liability. Although the circumstances in this case present an atypical condition, the facts are not equivalent to the types of freak injuries for which the law does not impose liability. See, e.g.,
 
 City of Ocala v. Graham,
 
 864 So.2d 473 (Fla. 5th DCA 2004) (holding that no view of the evidence supported conclusion that police officer’s failure to locate and speak with plaintiffs estranged husband was the proximate cause of her injuries when he later shot her in the face causing severe and permanent injuries);
 
 National Airlines, Inc. v. Edwards,
 
 336 So.2d 545 (Fla.1976) (holding trial court properly dismissed complaint for illness due to the consumption of Cuban food and drink, necessitated by airplane hijacking that airline should have prevented);
 
 Leitch v. City of Delray Beach,
 
 41 So.3d 411 (Fla. 4th DCA 2010) (affirming directed verdict that city was under no duty to warn against the possibility of a stray bullet fired during New Year’s Eve celebrations).
 

 The trial court concluded that its exercise of common sense did not usurp the jury’s role to determine foreseeability because the evidence demonstrated that the cause of Olson’s death supported no more than a single reasonable inference-a previously unknown, undetected disease. We disagree with this conclusion of Dr. Anderson’s testimony by deposition and as clarified through his affidavit. Because we conclude that the trial court erred in concluding that there was no dispute of material fact concerning the proximate causation of Olson’s death by drowning, we reverse.
 

 REVERSED and REMANDED.
 

 EVANDER, J., and TURNER, G.B., Associate Judge, concur.
 

 [1]
 

 . The trial court earlier denied Appellees' motion for summary judgment on the question of duty.